**ARKANSAS LOUISIANA GAS COMPANY, a Delaware corporation, Plaintiff,**

v.

**W. R. STEPHENS INVESTMENT CO., Inc., an Arkansas corporation, Defendant.**

**Civ. A. No. 711.**

United States District Court
W. D. Arkansas, El Dorado Division.
June 18, 1956.

---

2. Schiffman v. Wilkinson, 9 Cir., 216 F.2d 589, and Shepherd v. United States Attorney General, D.C., 108 F.Supp. 13.

**842**

Mahony & Yocum, El Dorado, Ark., Blanchard, Goldstein, Walker & O'Quin, Shreveport, La., for plaintiff.

Harper, Harper & Young, Ft. Smith, Ark., for defendant.

JOHN E. MILLER, District Judge.

### Findings of Fact

**1.**

Plaintiff, Arkansas Louisiana Gas Company, is a corporation under the laws of the State of Delaware and is domiciled in and a citizen and inhabitant of that State. Defendant, W. R. Stephens Investment Co., Inc., is a corporation under the laws of the State of Arkansas and is domiciled in and a citizen and inhabitant of the State of Arkansas, with its principal office at Little Rock, in the Eastern District of Arkansas. Both plaintiff and defendant are now, and have been since December 14, 1954, engaged in business in the El Dorado Division of the Western District of Arkansas and elsewhere in the State of Arkansas, respectively as a gas utility and as an investment dealer and broker.

**2.**

On and prior to December 14, 1954, the outstanding stock of which plaintiff was issuer was of one class, namely, common stock, and consisted of 3,801,609 shares of common stock which was then registered on the American Stock Exchange, a national securities exchange. On December 23, 1955, there was issued, as a stock dividend, to plaintiff's stockholders of record December 2, 1955, one share of plaintiff's common stock for each ten shares held by each such stockholder on the record date, and the shares comprising the stock dividend were likewise registered on the American Stock Exchange. No change in the status of the outstanding stock of which plaintiff is issuer, and its registration, has occurred since December 14, 1954, except the issuance and registration of the stock dividend on December 23, 1955.

### 3.

Since 1933, up to and including the present, defendant's business has been that of a bond broker, dealing primarily in Arkansas municipal bonds, and as a broker of other securities and bonds. During this time it has acted as trusted investment counselor for many people in Arkansas, a number of whom give defendant full discretion and authority to make investments for them. Many of its customers will not make investments or purchase stocks and bonds except through defendant. Defendant is interested as a stockholder or otherwise connected with several Arkansas banks and makes investments for these banks and persons connected with them.

### 4.

Defendant became interested in the natural gas industry in 1945 when it purchased the Fort Smith Gas Company from a holding company under an order of the Securities and Exchange Commission (hereinafter referred to as S.E.C.) requiring the holding company to dispose of its interest in the Fort Smith Gas Company.

Prior to 1954, the S.E.C. had ordered Cities Service Company (hereinafter referred to as Cities) to dispose of its interest in plaintiff in compliance with Section 11(b) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k (b). Defendant learned of this, made a study of plaintiff corporation and bought some of its stock early in 1954 because it appeared to be a good investment and defendant wished to feel out the desire of people in that part of Arkansas served by plaintiff to invest in such a utility. Defendant met with success in brokering this stock to its friends and customers, and after several months of efforts to make financial arrangements, worked out a plan with Mississippi River Fuel Corporation (hereinafter referred to as Mississippi) to finance the purchase of Cities' holdings in plaintiff. In October, 1954, defendant reached an agreement with Cities to purchase from it 1,958,189 shares which it owned out of plaintiff's total outstanding common stock of 3,801,609 shares. Defendant agreed to pay $12.50 per share, plus $2,682.45 per day from October 1, 1954, to closing date, subject to approval of the sale by the S.E.C. and exemption of defendant as a holding company. Applications for such approval and exemption were made to the S.E.C., which on December 14, 1954, entered an order approving the sale by Cities to defendant of its shares in plaintiff corporation, comprising approximately 51½ percent of its total outstanding common stock, and granting defendant exemption from the Public Utility Holding Company Act of 1935 on the ground it was acquiring this stock for purposes of distribution.

### 5.

Prior to December 14, 1954, defendant had acquired approximately 50,000 to 60,000 shares of plaintiff corporation, and on that date sold these to Vance Thompson, of McCrory, Arkansas, in order to raise funds for the Cities' purchase, and thereafter as a part of the transaction disposed of the stock for Thompson, as his agent on a commission basis. Thereafter, at 11:30 p. m. on December 14, 1954, defendant purchased said 1,958,189 shares of plaintiff's common stock from Cities for a total purchase price of $24,675,863.80, pursuant to agreement, and concurrently pledged the same to the National City Bank of New York as security for approximately $19,700,000 used by defendant to pay Cities. The pledge included these shares and all dividends therefrom, in stock or otherwise.

### 6.

None of the shares purchased from Cities has been sold, except that on January 17, 1956, approximately 45 percent thereof was sold to Union Securities of New York at defendant's cost. This sale was made pursuant to a prior commitment to dispose of the stock as Mississippi directed, and as a further step toward final distribution of the stock. This sale resulted from a decision that the original spin-off of production properties was not practical. Otherwise, the Cities' stock

belonging to and purchased by defendant still remains under pledge and none has ever been sold.

7.

Subsequent to December 14, 1954, defendant received many requests from numerous customers, and from friends, neighbors and relatives of defendant's officers and employees, and from many of plaintiff's employees, for defendant to obtain for them stock in plaintiff corporation. Defendant would undertake to fill their orders therefor, and as a result took and filled a number of such orders in accordance with such requests. A great majority of these requests came from persons for whom defendant had previously handled investments. Many of these persons were unfamiliar with stock exchanges and stock brokers and would buy securities only from defendant. Also, these persons knew of defendant's interest in plaintiff corporation and looked to defendant for information about buying plaintiff's stock. Defendant was willing to perform, and did perform, this service without expectation of or intent to profit, in order to interest Arkansas people in the stock. Defendant only hoped to break even in the distribution of the stock in this manner, and did not use its position as a stockholder in plaintiff corporation to obtain or to use information from the company with intent to make a profit for itself.

8.

Defendant executed these orders for the purchase of plaintiff's stock through other brokers, principally Merrill Lynch, Pierce, Fenner & Beane; A. G. Edwards & Sons; Goldman Sachs & Company; and Abrahams & Company. In some instances shares were delivered by the defendant to its customers with draft attached, and in other instances shares were held until the customer could pay the purchase price. In many cases, defendant would arrange loans for the customers. In a few cases, customers of defendant asked it to sell their shares, and in all of these cases, defendant would execute the sell orders to fill the buy orders of other customers.

9.

From December 15, 1954, to January 20, 1956, when defendant discontinued this method of serving its customers because of a suggestion that the practice might be questioned, defendant purchased a total of 112,519 shares of plaintiff's stock, in addition to the purchases and sales made for Thompson or Thompson Bros. Investment Company on a commission basis. Of the total shares purchased, 93,905 shares were used to fill orders of customers, and 18,686 shares were retained by the defendant for its own account.

10.

Defendant, in executing these orders for its customers and friends, recorded the same on its books in the same manner it had always used to record the purchase and sale of bonds, because its records were set up in that manner. Defendant had never set any other method of handling securities such as those of plaintiff and did not regard it of any significance to make a distinction between recording this and its usual type of bond transaction. The method of recording the filling of these orders was just as compatible with a brokerage transaction as with a purchase and sale.

11.

Defendant's theory of computing gross profits is to take the difference between the total recorded purchase price and the total recorded sales price of the shares involved in the transactions during the period December 15, 1954, to January 20, 1956, allocating to the last 18,686 shares the highest recorded purchase price, which will produce the maximum overall gross profit. If this procedure is used, defendant's gross profit would be $914.50.

On the other hand, plaintiff's theory of computing profits is to match sales at the highest unit price per share with purchases at the lowest unit price per share, within a six-months period. If

this method is used, defendant's gross profit would be $61,031.63, when the original purchase of 1,958,189 shares is omitted from the computation. If the latter shares are included in the computation, the gross profit would be $231,490.96.

The method of computing profits urged by plaintiff results in a figure which represents the maximum possible gross profits, without credit for any possible losses.

### 12.

During the period from December 15, 1954, to January 20, 1956, defendant incurred expenses in the amount of $32,526.90 in filling these orders for plaintiff's stock. This total expense figure includes $3,927.96 in bank charges, taxes, and insurance directly incurred, and $28,598.94 resulting from an allocation of 25 percent of certain items of defendant's total operating expenses to the expense of handling plaintiff's stock.

### Discussion

The principal question before the court is whether the provisions of 15 U.S.C.A. § 78p, Sec. 16 of the Securities Exchange Act, apply to purchases and sales made by a dealer or broker in the manner heretofore set out in the findings of fact. Defendant contends that such transactions are not contemplated by the Act, while plaintiff contends that said transactions are clearly covered.

█ At the outset it should be noted that the purpose of the statute is to prevent unfair use of inside information by a principal stockholder, director, or an officer of the corporation, and the fact that such person may act in complete good faith without any inside information is no defense in an action brought under the statute. Walet v. Jefferson Lake Sulphur Co., 5 Cir., 202 F.2d 433; Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, 148 A.L.R. 300, certiorari denied 320 U.S. 751, 64 S.Ct. 56, 88 L. Ed. 446; Carr-Consolidated Biscuit Co. v. Moore, D.C.Pa., 125 F.Supp. 423; Truncale v. Blumberg, D.C.N.Y., 80 F. Supp. 387.

█ Sec. 78p, supra, applies to any person who is the beneficial owner of more than 10 percent of any class of any equity security which is registered on a national securities exchange. Subd. (b), § 16, of the Act provides, as follows:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

It will be noted that the section applies to "any purchase and sale, or any

sale and purchase". The Act defines the terms "purchase" and "sale" as follows:

"(13) The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire.

"(14) The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." 15 U.S.C.A. § 78c(a).

The court is of the opinion that the transactions involved in the instant case were purchases and sales within the meaning of the statute. It is true that the major part of the stock purchased by defendant during the period herein involved was purchased to fill orders of customers, and that defendant was acting in good faith in buying and selling the stock. Defendant merely purchased the stock at the prevailing market price and in turn filled the orders of customers, charging them the prevailing market price at the time the order was completed. But it must be remembered that defendant was not handling the stock on a commission basis. It is also clear from plaintiff's Exhibit 2 (Schedules 1 and 2) that defendant did not, as a general rule, take an order from a customer for a particular number of shares and then purchase that number of shares for the customer. Instead, defendant purchased shares in various amounts, replenishing its stock when necessary to fill orders.

In other words, a considerable period of time might elapse between the time defendant would purchase particular shares of stock at the then market price, and the time defendant would sell said shares to a customer at the market price then prevailing. This, of course, would result in a profit to defendant in the event the stock had increased in market value, or a loss in the event the stock had decreased in market value. Thus the procedure defendant was following would have permitted it to do the very thing Section 78p was designed to discourage, i. e., make unfair use of inside information and engage in short-swing speculation. And the fact that defendant concededly acted in good faith upon requests of customers and did not use inside information does not exempt defendant from the provisions of the Act.

[4] The court's opinion that such transactions were purchases and sales within the meaning of Section 78p is fortified by the fact that if Congress had intended to exempt transactions by dealers and brokers, the Act would have so stated as was done in other sections of the Act. For example, 15 U.S.C.A. § 77d(2), exempts "brokers' transactions, executed upon customers' orders on any exchange or in the open or counter market" from the provisions of Sec. 77e. If brokers' and dealers' transactions were intended to be exempted from Sec. 78p, supra, it seems that the section would have contained such a provision. Instead, the section provides that the Commission by rules and regulations may exempt any transaction or transactions from said section.

In accordance with Sec. 78w, the Securities and Exchange Commission has adopted a number of rules exempting certain securities therefrom. One such exemption is contained in 17 C.F.R., Sec. 240.16a–5, which reads as follows:

"Exemption from section 16 of securities purchased or sold by odd-lot dealers. Securities purchased or sold by an odd-lot dealer (a) in odd-lots so far as reasonably necessary to carry on odd-lot transactions or (b) in round-lots to offset odd-lot transactions previously or simultaneously executed or reasonably anticipated in the usual course of business, shall be exempt from the provisions of section 16 of the act, with respect to participation by such odd-lot dealer in such transactions. (Sec. 16(a), 48 Stat. 896; 15 U.S.C. 78p(a).)"

However, there is no exemption for ordinary dealers and brokers. As a matter of fact, a number of the sales made by the defendant in the instant case were in odd lots, but defendant has made no contention and the evidence is not sufficient to establish that it is an odd-lot dealer within the meaning of the exemption.

Therefore, the court is convinced that the transactions involved herein were purchases and sales within the meaning of the Act, and the remaining question is the amount of profit recoverable from defendant by plaintiff.

In Smolowe v. Delendo Corp., supra [136 F.2d 239], the Court of Appeals for the Second Circuit established the rule of "lowest price in, highest price out" in determining the amount of recoverable profits under the Act. That decision has been followed in subsequent cases in the same circuit. Gratz v. Claughton, 2 Cir., 187 F.2d 46, certiorari denied 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353; Steinberg v. Sharpe, D.C. N.Y., 95 F.Supp. 32, affirmed 2 Cir., 190 F.2d 82; Kogan v. Schulte, D.C.N.Y., 61 F.Supp. 604. Of course, the decisions of the courts in the Second Circuit are not binding on this court, but they are entitled to great weight. A consideration of the statute, particularly in view of its stated purpose of preventing unfair use of inside information, convinces the court that the rule of computing profits adopted by the Second Circuit should be followed in this case.

The defendant, however, is entitled to allowance for the expenses it incurred in handling these transactions. See, Blau v. Mission Corp., 2 Cir., 212 F.2d 77, certiorari denied 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138. Defendant contends that its expenses totaled $53,-323.96, being the direct expenses of transfer taxes, insurance, and bank charges, together with one-fourth of certain operating expenses of the company. On the other hand, plaintiff contends that the expenses should be limited to $9,687.-22, being the direct expenses plus one-fourth of the expense items of office supplies, postage, and telephone, teletype and telegraph.

The court has concluded that the amount of defendant's expenses properly allocable to the transactions in question is $32,526.90. In arriving at this figure the court has allowed as expenses one-fourth of the following expenses: automobile, general overhead, office rent, office salaries, office supplies, postage, and telephone, teletype, and telegraph. The court has disallowed defendant's claimed expenses for salesmen's salaries since no sales campaign was made to sell the stock in question. Likewise, the court has disallowed defendant's claim for travel and entertainment expenses. On the other hand, the court is allowing certain items of expense which plaintiff contends should not be allowed, such as general overhead, office rent, office salaries, and automobile expenses. The evidence disclosed that the transactions in question consumed at least one-fourth of the time of defendant's employees during the period, and the court feels that one-fourth of the named items is properly allowable as expenses.

A question is presented as to whether the original purchase of 1,958,-189 shares should be used in computing the profits recoverable by plaintiff. In a recent opinion the Court of Appeals for the Second Circuit held that such a purchase should be considered. Stella v. Graham-Paige Motors Corp., 2 Cir., 232 F.2d 299. Judge Hincks, in a well-reasoned dissenting opinion, pointed out the weakness of the majority decision. This court is of the opinion that Judge Hincks' reasoning is correct and that the original purchase should not be considered in computing the recoverable profits.

The gross profit attributable to defendant is $61,031.63, and its expenses were $32,526.90, leaving the amount of $28,504.73 recoverable by plaintiff.

Conclusions of Law

1.

The court has jurisdiction of the parties to and the subject matter of this action.

2.

Defendant became, on December 14, 1954, and remained through January 20, 1956, the beneficial owner of more than 10 percent of one class, namely common stock, of an equity security of which plaintiff was issuer (not an exempted security) and which was then and has ever

since been registered on a national securities exchange.

**3.**

Defendant, while the beneficial owner of more than 10 percent of one class of the equity security of the issuer (plaintiff) registered on a national securities exchange, realized gross profits from purchases and sales, and sales and purchases, of equity securities (other than an exempted security) of such issuer, all made within periods of less than six months, of $61,031.63, which profit inures to and is recoverable by plaintiff, the issuer of such equity securities.

**4.**

Defendant is entitled to credit against the amount otherwise recoverable herein for its expenses amounting to $32,526.90.

**5.**

This suit is properly brought as one for an accounting. The court concludes however, that the account between the parties can properly be stated from the evidence in the case and judgment should be entered for plaintiff and against defendant in the amount of $28,504.73.