Gordon GUND, Plaintiff-Appellee, Cross-Appellant,

v.

FIRST FLORIDA BANKS, INC., formerly, First Financial Corporation, Defendant-Appellant, Cross-Appellee.

No. 82–3144.

United States Court of Appeals, Eleventh Circuit.

March 5, 1984.

---

Claude H. Tison, Jr., Tampa, Fla., for defendant-appellant, cross-appellee.

Thomas C. MacDonald, Jr., John I. Van Voris, Raymond T. Elligett, Jr., Tampa, Fla., for plaintiff-appellee, cross-appellant.

Before FAY and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

FAY, Circuit Judge:

Cross-appellant, Gordon Gund, a director of First Florida Banks, Inc. ("First Flori-da") since 1971, acquired in 1972 and 1973 substantial blocks of First Florida convertible subordinated debentures. The debentures were convertible into shares of First Florida common stock at a predetermined ratio. During an eight-month period in 1976 and early 1977, Gund engaged in a series of transactions by which he sold his entire First Florida debenture holdings and purchased a large amount of First Florida common stock.

Gund commenced this action in the United States District Court for the Middle District of Florida on April 25, 1977, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 (1976) that section 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(b) (1976) ("1934 Act"), was not applicable to his sales of debentures and purchases of common stock. First Florida counterclaimed, seeking a recovery of Gund's short-swing profits under section 16(b). Cross-motions for summary judgment were filed. The district court granted First Florida's motion, entering an opinion and order on January 20, 1982 holding that section 16(b) controlled Gund's transactions. The district court on September 29, 1982 entered a supplemental opinion addressing the calculation of damages and the final judgment based thereon, in favor of First Florida against Gund in the amount of $29,-084.10. First Florida appealed from the final judgment and Gund cross-appealed from both the judgment and the district court's initial opinion and order on liability. We agree with the district court that section 16(b) controls the transactions at issue here and that the court's calculation of profits recoverable by First Florida is proper under the statute. We therefore affirm the district court's grant of summary judgment as to both liability and profit computation.

This appeal raises two issues: (1) whether the sale by an insider of a convertible security, followed within six months by the purchase of the underlying conversion security, constitutes a short-swing transaction controlled by section 16(b) notwithstanding the fact that two different classes of equity

securities are involved which are allegedly not trading in relation to one another; and (2) whether a profit calculation which limits the "profits" attributable to a series of short-swing transactions and thus recoverable by the issuer of the securities to the six-month period surrounding the transactions is a proper measure of recovery under section 16(b).

## I.  FACTUAL BACKGROUND

Our presentation of the facts is gleaned from the parties' stipulation of facts submitted in conjunction with their cross-motions for summary judgment. Because no factual disputes are involved, our review is limited to a consideration of whether the district court correctly applied the 1934 Act to Gund's transactions.

First Florida, registered as a bank holding company with the Securities & Exchange Commission ("SEC" or "the Commission"), has issued two types of equity security: common stock, consisting of 11,713,645 outstanding shares, and a series of 6⅞% convertible subordinated debentures. The debentures, issued in denominations of $1,000, were originally sold to the public in December, 1971 at par[1] and are freely convertible into shares of First Florida common stock at a conversion price of $12⅛ per share. Thus, each $1,000 debenture can be converted into 82.47 shares of First Florida common stock. Both the common stock and the debentures are publicly traded in the over-the-counter market.

Gund became a director of First Florida in 1971 and has since continuously served in

that capacity. Although it is stipulated that Gund was not a "controlling person" of First Florida within the meaning of the 1934 Act and that Gund did not take advantage of inside information in effecting any of the transactions at issue, he is concededly an "insider" for section 16(b) purposes.[2] At various times during 1972 and 1973, Gund purchased debentures which had an aggregate face value of $605,000. Gund was also the direct and beneficial owner of 109,127 shares of First Florida common stock. His debenture holdings remained unchanged until 1976.

During the 1970's, the market for the two classes of First Florida securities underwent severe upheavals. In 1971, the year the debentures were issued, through 1973, there was little change in the market for First Florida stock or debentures. Both traded near the levels implied in their offering prices, i.e., the debentures sold for roughly their face value and the stock traded in the neighborhood of $12. Beginning in early 1974, both the bond market and the market for Florida bank stock began a serious decline. By 1976, the 6⅞% debentures, due to increases in interest rates, were selling at about 75% of their face value; First Florida common stock had plunged by 50%, selling for $6 per share or less.

In this market situation Gund engaged in a series of transactions, consummated at regular intervals from July, 1976 to March, 1977, by which he sold his entire bond holdings and used the proceeds to purchase approximately 77,000 shares of First Florida common stock.[3] Had Gund simply convert-

---

1.  As referenced herein, "par" represents the face amount of the debentures, namely $1,000.

2.  An "insider" is "[e]very person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity

security ... or who is a director or an officer of the issuer of such security...." 15 U.S.C. § 78p(a) (1976).

3.  The debenture sales and stock purchases can be summarized as follows:

| DATE | DEBENTURES SOLD (SHARE EQUIVALENT) | | NET SALE PROCEEDS | SHARES PURCHASED | PER SHARE COST | NET COST OF PURCHASE |
|---|---|---|---|---|---|---|
| 2/18/76 | | | | 10,000 | 5 13/16 | $ 58,125 |
| 7/19/76 | 100,000 | (8247) | $ 75,000 | 10,000 | 6 1/8 | 61,250 |
| 7/20/76 | | | | 2,500 | 6 | 15,000 |
| 8/9/76 | 100,000 | (8247) | 75,000 | 12,500 | 6 1/8 | 6,562.50 |

ed the debentures he would have received 49,895 shares of common stock. Thus by selling the debentures for cash and then purchasing common stock, Gund gained fifty percent more stock than he would have through a simple conversion. Gund also bought 15,000 more shares of First Florida stock with new capital unrelated to the sale of the convertible debentures.

## II. THE APPLICABILITY OF SECTION 16(b)

Gund contends that although his sales of debentures and purchases of common stock took place within the statutory six-month prohibition period, the transactions offered no possibility for short-swing profits based on inside information because the two classes of securities were not trading in relation to each other in the market.[4] As the possibility of the speculative abuse of inside information which section 16(b) was drafted to prevent was not present, Gund argues the statute should not control his transactions. He maintains that his sales and purchases, considered in light of recent judicial decisions adopting a pragmatic approach to section 16(b) liability, should thus not constitute a section 16(b) violation. We disagree.

Section 16(b) provides, *inter alia,* that:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, or any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months....

15 U.S.C. § 78p(b) (1978).

Congress recognized that short-swing trading by insiders with advance, inside information would threaten the goal of the 1934 Act to "insure the maintenance of fair and honest markets." 15 U.S.C. § 78(b) (1976). Insiders could exploit information not generally available to others to secure quick profits. As the Supreme Court has noted, "the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably

| DATE | DEBENTURES SOLD (SHARE EQUIVALENT) | | NET SALE PROCEEDS | SHARES PURCHASED | PER SHARE COST | NET COST OF PURCHASE |
|---|---|---|---|---|---|---|
| 8/13/76 | 100,000 | (8247) | 75,000 | 12,500 | 6 1/8 | 76,562.50 |
| 8/25/76 | 100,000 | (8247) | 75,000 | 12,500 | 6 | 75,000 |
| 9/1/76 | | | | 2,500 | 5 5/8 | 14,062.50 |
| 3/2/77 | 205,000 | (16,907) | 164,000 | 30,000 | 6 1/8 | 183,750 |
| | 605,000 | (49,895) | $464,000 | 92,500 | | $560,312.50 |

4. Specifically, Gund alleges that the debentures were selling as fixed-price debt securities during the relevant period and that their price was influenced solely by fluctuation in interest rates, with the conversion feature of the debentures rendered meaningless due to the drastic drop in the market price of the common stock. Gund argues that the factors which would affect common stock prices could therefore not affect debenture prices, and vice versa. Thus, Gund's sales and purchases were not "matching transactions" so as to give rise to the type of short-swing profits addressed by section 16(b). Although we have serious doubts as to whether the market fluctuation of a convertible security and its underlying conversion security can *ever* insulate the securities from abusive short-swing transactions by insiders with the "right" type of inside information, we do not need to decide this question here.

great." *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 602, 30 L.Ed.2d 575 (1972).

The flat prohibition of a certain class of transactions, embodied in section 16(b), is a rather uncommon regulatory mechanism. Unlike other remedial provisions of the 1934 Act, the most noteworthy being section 10(b), 15 U.S.C. § 78j(b) (1976), Congress drafted section 16(b) as an objective rule, designed to have a clearly "prophylactic" effect. *Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962). To ensure that section 16(b) efficaciously put an end to unfair inside trading, Congress explicitly did not condition the section's application on proof of an insider's intent to trade on a short swing. "In short, this statute imposes liability without fault within its narrowly drawn limits." *Foremost-McKesson, Inc. v. Provident Securities Co.,* 423 U.S. 232, 251, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1976).

Although this "objective" approach has been consistently applied since the 1934 Act's inception to transactions which fall literally within the statutory language, several courts have recently attempted to interpret section 16(b) for situations which do not obviously fall within its scope. Because of section 16(b)'s mechanical effect, some courts have hesitated to construe "borderline" transactions as under its scope when congressional intent is unclear and the transaction in question is not of a type giving rise to speculative abuse. Under this "subjective" or "pragmatic" approach, an initial determination is made as to whether a transaction falls within the literal language of section 16(b). If an ambiguity is apparent, the inquiry becomes whether the transaction involved carries a potential for inside abuse. Only those transactions which are susceptible of abuse are found to be within the statutory scope. The vast majority of cases in which the pragmatic approach has been followed involve involuntary transactions which are triggered by a corporate reorganization; the courts have typically found such transactions to be not clearly encompassed within the statutory definitions of "purchase" and "sale." *See, e.g., Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 593–95, 93 S.Ct. 1736, 1744–45, 36 L.Ed.2d 503 (1973) (sales in context of blocked tender offer outside of section 16(b) prohibitions); *Heublein, Inc. v. General Cinema Corp.,* 722 F.2d 29 at 30–31 (2d Cir.1983) (involuntary exchange of stock by statutory insider for shares in the survivor of a corporate merger not prohibited by section 16(b)); *cf. Texas International Airlines v. National Airlines, Inc.,* 714 F.2d 533 (5th Cir.1983) (narrow "unorthodox transaction" exception to absolute liability in hostile takeover context inapplicable where putative insider voluntarily made cash-for-stock sale within statutory six-month period); *Kay v. Scientex Corp.,* 719 F.2d 1009 (9th Cir.1983) (overissuance of stock by corporation to insider considered a purchase under section 16(b) since parties voluntarily engaged in short-swing sale).[5]

■ Gund urges that his debenture sales and stock purchases should be analyzed under such a pragmatic approach, and that under such an analysis his transactions contain no potential for insider abuse. However, the law is clear that the pragmatic approach is used to determine the boundaries of section 16(b)'s definitional scope *only* in borderline situations, particularly those involving unorthodox transactions. *Kern County Land Co.,* 411 U.S. at 594–95, 93 S.Ct. at 1744–45. When a transaction clearly falls within the statutory language, the pragmatic approach is not applicable. *Mouldings, Inc. v. Potter,* 465 F.2d 1101, 1104–05 (5th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1368, 35 L.Ed.2d 591 (1973);[6] *Tyco Laboratories, Inc. v. Cutler-*

---

**5.** *See also Foremost-McKesson, Inc. v. Provident Securities Co.,* 423 U.S. 232, 252, 96 S.Ct. 508, 520, 46 L.Ed.2d 464 (1976) (person must be 10% owner prior to purchase at issue); *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 424 n. 4, 92 S.Ct. 596, 600 n. 4, 30 L.Ed.2d 575 (1972) (person must be 10% owner at time of sale at issue).

**6.** Fifth Circuit decisions handed down prior to October 1, 1981, are binding precedent upon this court, unless reversed by this court sitting

*Hammer, Inc.,* 490 F.Supp. 1, 7 (S.D.N.Y. 1980).

We have no doubt that section 16(b) literally applies to Gund's transactions.[7] Gund has stipulated to every element of section 16(b) liability. It is undisputed that the transactions were sales and purchases, respectively, of the convertible and conversion securities. Gund acknowledges that they are equity securities and that he is an insider with respect to First Florida. The sales and purchases were never separated by more than one day and were sometimes simultaneous. There is, simply, no ambiguity to resolve. The transactions present no element of liability that would require a pragmatic approach, or any other analysis, to determine its presence. We thus do not even undertake a pragmatic approach analysis as to whether Gund's transactions were susceptible of insider abuse. Since there is no ambiguity as to whether the literal language of section 16(b) applies to these transactions, any contention by Gund that the statute should not encompass his 1976 and 1977 sales and purchases must be made to Congress, not to the courts.

en banc. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

7. Although not necessary to our disposition of the case, we note that the SEC has specifically interpreted section 16(b) to include within its prohibitions the very type of transactions at issue here. Recognizing the inflexibility of the flat prohibition embodied in section 16(b), Congress incorporated in the 1934 Act exemptive powers with regard to section 16(b). *See* 15 U.S.C. § 78p(b) (1976). The SEC was given the power to exempt any type of transaction from section 16(b) coverage if, in the Commission's judgment, the transaction does not open itself to insider abuse. The Commission has utilized its rulemaking powers on several occasions to grant exemptions, including an exemption for a limited class of conversion transactions. SEC Rule 16b–9, adopted in 1967, provides that:

Any acquisition or disposition of an equity security involved in the conversion of an equity security which, by its terms or pursuant to the terms of the corporate charter or other governing instruments, is convertible immediately or after a stated period of time into another equity security of the same issuer, shall be exempt from the operation of section

## III. THE PROFIT COMPUTATION METHOD

Both Gund and First Florida challenge the profit calculation employed by the district court. The district court calculated Gund's profits by using a computation suggested by SEC Rule 16b–6(b). This rule is designed to calculate profits from a sale of securities within six months of the exercise of an employee stock option. *See* 17 C.F.R. § 240.16b–6(b) (1980). In its supplemental opinion and order, the district court concluded:

Under [Rule] 16b–6 the SEC, in order to alleviate the inherent unfairness of matching a sale at current market price with a purchase price established at a much earlier date when the option was granted, limits profits to the difference between the actual sales price and the lowest market price within six months before or after the sale date. The computation of profits in the instant case can be treated in a similar manner by matching the actual purchase price the plaintiff paid for the common stock with the highest market price of the common stock within six months before or after the date on which the debentures (convertible

16b of the Act: *provided, however,* that this section shall not apply to the extent that there shall have been either (1) a purchase of any equity security of the class convertible (including any acquisition of or change in a conversion privilege) and a sale of any equity security of the class issuable upon conversion, or (2) a sale of any equity security of the class convertible and any purchase of any equity security issuable upon conversion (otherwise than in a transaction involved in such conversion or in a transaction exempted by any other rule under section 16(b) within a period of less than 6 months which includes the date of conversion.

17 C.F.R. § 240.16b–9(a) (1980).

This section exempts "pure conversions" from liability, but specifically denies exemptions to transactions involving the sale of a convertible security and the purchase of the conversion security. Although the Commission's interpretive rules are not binding authority upon the federal courts, the exemption embodied in Rule 16b–9 is consistent with our conclusion that Gund's transactions were intended to be prohibited by the statute.

into common stock) were sold. Calculation of profit by this method yields a figure of $29,084.00 . . . .

R. at E-42.

Gund urges that the profits should have been computed in the amount of $5,904.14, while First Florida urges a recovery of $164,643.12.[8]

The profit computation method most frequently utilized by courts in section 16(b) cases is that set forth long ago by the Second Circuit in *Smolowe v. Delendo Corp.,* 136 F.2d 231, *cert. denied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). *See Whittaker v. Whittaker Corp.,* 639 F.2d 516 (9th Cir.1981); *Western Auto Supply Co. v. Gamble-Skogmo, Inc.,* 348 F.2d 736, 742–43 (8th Cir.1965), *cert. denied,* 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966); *Morales v. Mylan Laboratories, Inc.,* 443 F.Supp. 778, 780 (W.D.Pa.1978); *Heli-Coil Corp. v. Webster,* 222 F.Supp. 831, 837 (D.N.J.1963), *aff'd as modified on other grounds,* 352 F.2d 156 (3d Cir.1965); *Arkansas Louisiana Gas Co. v. W.R. Stephens Investment Co.,* 141 F.Supp. 841, 847 (W.D.Ark.1956); *See also Ohio Drill & Tool Co. v. Johnson,* 498 F.2d 186, 194–95 (6th Cir.1974) (directing that *Smolowe* rule be used in profit computation under state insider trading statute). Under the *Smolowe* rule, the highest sales price is matched with the lowest purchase price in any given six-month period in order to calculate the recoverable profit.

■ Were we writing on a clean slate today, we might well conclude that a district court in a section 16(b) case should employ the *Smolowe* rule rather than utilize a method patterned after Rule 16b–6. The district court's computation method yields a slightly different result from that calculated under the *Smolowe* rule. We, however, find either method to be consistent with the

language and purpose of the 1934 Act. Both methods limit the profits recoverable in this type of case to those that accrued within the six-month period surrounding the short-swing transactions. Such a limitation is clearly consistent with the remedial, rather than punitive, nature of section 16(b). Accordingly, we uphold the district court's calculation of the amount recoverable by First Florida.

Finding that the district court properly found Gund's transactions to be controlled by section 16(b) and that the district court's profit computation method is consistent with the statute, we AFFIRM.

---

**8.** Gund's figure of $5,904.14 is based on the presumption that because the debentures' price reflects their character as a fixed-return debt security as well as their conversion value, only a portion of the debentures' sales price should be considered in making the section 16(b) calculations. For the reasons which we stated above, the statute does not permit such speculation. First Florida calculates Gund's profits

by considering the debentures' price and value since their purchase in 1972. This calculation, resulting in a figure of $164,643.12, directly conflicts with congressional intent that section 16(b) be a disgorgement statute only, and that security prices within six months surrounding Gund's transactions should therefore alone be considered.