11-3620-cv
*Gibbons v. Malone*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: September 21, 2012                              Decided: January 7, 2013)

Docket No. 11-3620-cv

_____

MICHAEL D. GIBBONS,

*Plaintiff-Appellant*,


v.


JOHN C. MALONE,

*Defendant-Appellee*,

and

DISCOVERY COMMUNICATIONS, INC.,

*Nominal Defendant-Appellee*.


_____

Before: LEVAL, CABRANES, and KATZMANN, Circuit Judges.

Section 16(b) of the Securities Exchange Act of 1934 provides for the disgorgement of profits that corporate insiders realize "from any purchase and sale, or any sale and purchase, of any equity security of [the corporate] issuer . . . within any period of less than six months." 15 U.S.C. § 78p(b). In this appeal, which follows the dismissal of the complaint under Rule 12(b)(6) in the

United States District Court for the Southern District of New York (Barbara S. Jones, *Judge*), the question presented is whether this so-called "short-swing profit rule" applies when a corporate insider sells shares of one type of stock issued by the insider's company and purchases shares of a *different* type of stock in that same company. We hold, absent any guidance from the SEC, that § 16(b) does not apply to transactions of this sort involving separately traded, nonconvertible stocks with different voting rights.

Affirmed.

DANIEL E. DOHERTY (Charles J. Hyland, *on the brief*), Law Offices of Daniel E. Doherty, Overland Park, KS, *for Plaintiff-Appellant Michael D. Gibbons.*

ALEXANDRA M. WALSH (Seth T. Taube and Melissa Armstrong, *on the brief*), Baker Botts L.L.P., Washington, DC, and New York, NY, *for Defendant-Appellee John C. Malone.*

JOHN F. BATTER III (Nolan J. Mitchell, *on the brief*), Wilmer Cutler Pickering Hale and Dorr, Boston, MA, *for Nominal Defendant-Appellee Discovery Communications, Inc.*

JOSÉ A. CABRANES, *Circuit Judge*:

Section 16(b) of the Securities Exchange Act of 1934 (the "1934 Act") provides for the disgorgement of profits that corporate insiders[1] realize "from any purchase and sale, or any sale and purchase, of any equity security of [the corporate] issuer . . . within any period of less than six months." 15 U.S.C. § 78p(b). The question presented is whether this so-called "short-swing profit rule" applies when a corporate insider sells shares of one type of stock issued by the insider's company and purchases shares of a *different* type of stock in that same company. We hold, absent

---

[1] The term "insider" is frequently used in this context as a short-hand way of referring to any person "who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security." 15 U.S.C. § 78p(a)(1) ("Section 16(a) of the 1934 Act").

any guidance from the Securities and Exchange Commission ("SEC"), that § 16(b) does not apply to transactions of this sort involving separately traded, nonconvertible stocks with different voting rights.

## BACKGROUND

The facts in this case are straightforward and uncontested. Between December 4, 2008 and December 17, 2008, defendant-appellee John Malone—a director and large shareholder of Discovery Communications, Inc. ("Discovery")—engaged in nine sales of Discovery's "Series C" stock totaling 953,506 shares, and ten purchases of Discovery's "Series A" stock totaling 632,700 shares. Just under two years later, plaintiff-appellant Michael Gibbons brought this shareholder suit,[2] seeking disgorgement of "profits" that Malone realized from these transactions. Gibbons alleges that Malone obtained "illicit profits in the amount of at least $313,573" from these trades. Complaint ¶ 54.

Discovery's Series A stock and Series C stock are different equity securities, are separately registered, and are traded separately on the NASDAQ stock exchange under the ticker symbols DISCA and DISCK, respectively. The principal difference between the two securities is that Series A stock comes with voting rights—one vote per share—whereas Series C stock does not confer any voting rights. Series A stock and Series C stock are not convertible into each other. On the open market in late 2008 and early 2009, Series A stock generally traded at slightly higher prices than Series C stock, though occasionally not. On the nine relevant dates in question, the closing prices of Series A stock varied from about four-percent to eight-percent higher than the respective closing prices of Series C stock.

---

[2] As relevant here, 15 U.S.C. § 78p(b) allows "the owner of any security of the issuer" to sue for disgorgement "if the issuer shall fail or refuse to bring such suit." *See generally Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170, 173–180 (2d Cir. 2012) (describing the framework of shareholder suits under § 78p(b), and holding that such suits are consistent with Article III standing principles). Here, Discovery informed Gibbons that it would not bring suit against Malone because it did not believe that his transactions fell within the scope of § 16(b).

3

Following a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the United States District Court for the Southern District of New York (Barbara S. Jones, *Judge*) dismissed Gibbons's complaint for failure to state a viable § 16(b) disgorgement claim. The Court explained that the statute's use of the term "any equity security"—written in the singular— "undermines [Gibbons's] argument, as his theory requires the purchase and sale of any equity *securities*, rather than of one equity security." *Gibbons v. Malone*, 801 F. Supp. 2d 243, 247 (S.D.N.Y. 2011) (emphasis in original). The Court further pointed out that, unlike other financial instruments that are treated as functionally equivalent under § 16(b), Discovery's Series A stock and Series C stock are not convertible and do not have a fixed value relative to each other. *See id.* at 247–49. Finally, the Court noted:

> [T]he Court is unpersuaded by Plaintiff's policy arguments regarding the likelihood that "[p]ermitting short-swing trading between voting and non-voting common stock would make evasion of Section 16 trivially easy." (Pl. Br. at 11.) Even if this were true, the Supreme Court has "recognized the arbitrary nature of section 16(b), which is widely recognized as a 'crude rule of thumb'" to curb insider trading. *Schaffer v. Dickstein & Co., L.P.*, 1996 WL 148335[,] at \*5 (S.D.N.Y. Apr. 2, 1996) (citing *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 422 . . . (1972) & *Blau v. Lamb*, 363 F.2d 507, 515 (2d Cir. 1966)). The Supreme Court has also noted that "serving the congressional purpose [of Section 16(b)] does not require resolving every ambiguity in favor of liability . . . [.]" *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 252 . . . (1976). Further, Plaintiff's desired result would lead to a blurring of the bright-line rule established by Section 16(b), which was specifically "designed [by Congress] for easy application" . . . . *Cummings v. C.I.R.*, 506 F.2d 449, 453 (2d Cir. 1974).

*Id.* at 249. This appeal followed, raising the same question—namely, whether § 16(b) applies when an insider buys and sells shares of *different* types of stock in the same company, where those securities are separately traded, nonconvertible, and come with different voting rights.

## DISCUSSION

We review *de novo* a district court's dismissal under Rule 12(b)(6), "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146,

4

150 (2d Cir. 2010) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**A.**

The issue presented in this appeal is one of statutory interpretation, so we begin by examining the statutory text. *See Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011). Section 16(b) of the 1934 Act provides, in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . . This subsection shall not be construed to cover . . . any transaction or transactions which the [SEC] by rules and regulations may exempt as not comprehended within the purpose of this subsection.

15 U.S.C. § 78p(b). Notably, although § 16(b) is designed to curb the use of nonpublic knowledge by corporate "insiders," *see* note 1, *ante*, the provision offers merely the "prophylactic" remedy of disgorgement, *Blau v. Lehman*, 368 U.S. 403, 414 (1962), and "operates mechanically, with no required showing of intent" to profit from the use of inside information, *At Home Corp. v. Cox Commc'ns, Inc.*, 446 F.3d 403, 407 (2d Cir. 2006). The statute, in other words, "imposes a form of strict liability." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1417 (2012) (internal quotation marks omitted).

As we have previously explained, "if the conversion can be paired with another 'sale' or 'purchase,' and the paired transactions occur within a six month period, the paired transactions are . . . the type of insider activity that Section 16(b) was designed to prevent," *Blau v. Lamb*, 363 F.2d

507, 517 (2d Cir. 1966), but transactions of securities that cannot be "paired" are not within the scope of § 16(b). *Cf. Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243–44 (1976) (short-swing profit rule applies to profits realized from "a pair" of securities transactions). The question presented is whether a sale of one security and a purchase of a different security issued by the same company can be "paired" under § 16(b).

Congress's use of the singular term "any equity security" supports an inference that transactions involving *different* equity securities cannot be paired under § 16(b). *See At Home Corp.*, 446 F.3d at 408–09. As the District Court explained, correctly in our view:

> The text limits liability to profits realized from "the purchase and sale, or sale and purchase, of any equity security of the issuer." The drafters specifically chose to group "purchase and sale" and "sale and purchase" into single compounded units. This indicates that, to incur Section 16(b) liability, an insider's "purchase and sale" or "sale and purchase" must both be directed at the same prepositional object—i.e. the same equity security.

*Gibbons*, 801 F. Supp. 2d at 247; *cf. Am. Standard, Inc. v. Crane Co.*, 510 F.2d 1043, 1058 (2d Cir. 1974) ("The statute speaks of 'such issuer' in the singular. There is no room for a grammatical construction that would convert the singular into a plural."). The regulations promulgated by the SEC implicitly support this understanding of § 16(b) by noting that that the statute covers the purchase and sale, or sale and purchase, of "a security," and by providing for an exception when the purchase and sale of "such security" meets certain conditions. 17 C.F.R. § 240.16b-1.

Gibbons focuses on the statute's use of the word "any," but that word is unhelpful to his argument. No one doubts that Discovery's Series A stock and Series C stock are equity securities.[3] As we have just explained, however, the reason that the purchase and sale of *different* equity securities

---

[3] 15 U.S.C. § 78c(11) defines the term "equity security" as:

any stock or similar security; or any security future on any such security; or any security convertible, with or without consideration, into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any other security which the Commission shall deem to be of similar nature and consider necessary or appropriate, by such rules and regulations as it may prescribe in the public interest or for the protection of investors, to treat as an equity security.

6

falls outside of the scope of the statute is because the term "equity security" is singular—not because the securities at issue, viewed alone, would not fall within the meaning of the term "any equity security."

Accordingly, as we recently observed in passing, § 16(b) applies to the purchase and sale, or sale of purchase, of "the same security." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012). Indeed, it has been our longstanding view that although § 16(b) "*might* be read literally to permit a recovery where stock of one class is purchased and stock of another class sold," the likelihood "that Congress intended such a result is beyond the realm of judicial fantasy." *Smolowe v. Delendo Corp.*, 136 F.2d 231, 237 n.13 (2d Cir. 1943) (emphasis supplied).

**B.**

Gibbons argues that Discovery's Series A stock and Series C stock are "the same security" for purposes of the short-swing profit rule because those types of stock are "economically equivalent."[4] Though we do not decide the issue here, we note that § 16(b) could apply to transactions where the securities at issue are not meaningfully distinguishable. As a textual matter, it is settled that § 16(b) is not limited to "the purchase and sale of the *same certificates* of stock . . . ." *Smolowe*, 136 F.2d at 237 n.13 (emphasis supplied). Indeed, being able to match "the particular shares bought or sold" is "wholly irrelevant" under § 16(b) because of the "the fungible nature of shares of stock." *Gratz v. Claughton*, 187 F.2d 46, 51 (2d Cir. 1951). And in the related context of interpreting § 16(a) of the 1934 Act, *see* note 1, *ante*, we have explained that "corporate labels are not necessarily binding on the court," and that we would refuse to distinguish two ostensibly different securities based on a "sham characterization." *Ellerin v. Mass. Mut. Life Ins. Co.*, 270 F.2d 259, 265 (2d Cir. 1959).

---

[4] We refer to the "types of stock" not to introduce a new term of art into the securities-law lexicon, but rather, to avoid using existing terms of art such as "class" or "series," which have varied uses and meanings in securities law, particularly among the several states. Section 16(b) applies to the purchase and sale (or sale and purchase) of "any equity security"—*not* "any equity security within a class," or "any equity security within a series."

Recognizing the equivalence of essentially indistinguishable securities would also comport with the purpose of the short-swing profit rule. Although individual applications of § 16(b) do not depend at all on an insider's intent, *At Home Corp.*, 446 F.3d at 407, we generally interpret ambiguous terms of § 16(b) in a way "that best serves the congressional purpose of curbing short-swing speculation by corporate insiders," *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 424 (1972). When two types of stock are not meaningfully different, the risk of short-swing speculation is likely to be much higher than when those stocks are distinguishable, because shareholders would typically have little reason to convert holdings of one type of stock into holdings of another type that is effectively the same.

Discovery's Series A stock and Series C stock, however, are readily distinguishable. Most importantly, Series A shares confer voting rights, whereas Series C shares do not.[5] The two securities, therefore, are distinct not merely in name but also in substance. An insider could easily prefer one security over the other for reasons not related to short-swing profits.

Nor are Discovery's Series A stock and Series C stock the same security because of the so-called "economic equivalence" principle to which we have occasionally referred in earlier cases.

---

[5] Though not raised by the parties, we are aware of our comment in *Lamb*, 363 F.2d 507, that "the increase in voting power" caused by the conversion of the convertible securities at issue in that case was "irrelevant to the central question whether the conversion facilitated short-swing trading." *Id.* at 522. Understood in context, that statement does not contradict our reasoning here. In *Lamb*, the securities at issue were convertible at a fixed ratio, and therefore we took for granted that the purchased *convertible* security (preferred stock) could be paired with the sold *converted* security (common stock) for purposes of § 16(b). The question presented in *Lamb* was whether the conversion of the preferred stock into common stock at the fixed ratio constituted a "sale" under § 16(b). We explained that the voting rights and dividend attributes distinguishing common stock from preferred stock in *Lamb* were "irrelevant for present purposes" because those differences did not present the insider with "the possibility of reaping a trading advantage" by exercising the conversion right. *Id.*

By contrast, in this case it is undisputed that Malone "sold" the Series C stock, and we must instead assess whether the purchased security and the sold security can be "paired" as the same equity security under § 16(b). The question here, in other words, is *not* whether to limit the scope of § 16(b) based on a lack of apparent risk of speculative abuse but whether the relevant transactions may be paired under § 16(b) in the first place. In this context, we have explained that a risk of speculative abuse is insufficient to trigger liability. *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 310 (2d Cir. 1998). Accordingly, although the presence of voting rights is irrelevant in deciding whether, in certain circumstances, to construe a conversion as not a "sale," thus "*remov[ing]* the exchange from the ambit of Section 16(b)," *Lamb*, 363 F.2d 507 (emphasis supplied), the fact that here the voting rights differ between the two nonconvertible stocks at issue is highly relevant to whether those stocks may be paired under § 16(b).

*See, e.g.*, *Lamb*, 363 F.2d at 522. Rather, that principle has developed in the context of fixed-ratio *convertible* instruments, particularly with respect to whether exercising the conversion right is a "purchase" or "sale" within the meaning of § 16(b). As we explained in *Lamb*:

> [I]n general, the purchase by an insider of his issuer's convertible securities, followed in less than six months by their conversion, cannot facilitate short-swing trading for speculative profits in the convertible securities because normal market activity, including arbitrage trading, will insure that the convertible securities have a market price at least equivalent to the aggregate price of the securities into which they are convertible . . . .

*Id.* at 521. In other words, the fixed-ratio convertibility feature is what distinguishes economically equivalent securities. Indeed, we observed in *Lamb*, "at the risk of being obvious, . . . that 'economic equivalence' has no relevance in a situation where the convertible security did not trade at a price at least equivalent to the aggregate price of the securities into which it was convertible."[6] *Id.* at 524–25. Accordingly, two nonconvertible securities whose prices fluctuate relative to one another do not qualify as "economically equivalent."

Our understanding of "economic equivalence" is consistent with the views of the SEC, which is "uniquely experienced in confronting short-swing profiteering." *At Home Corp.*, 446 F.3d at 409. Based on its authority to interpret the 1934 Act, the SEC has explained that "derivative securities" that are considered an equity security under § 16(b) include "any option, warrant, convertible security . . . or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security," 17 C.F.R. § 240.16a-1(c), but do not include "[r]ights with an exercise or conversion privilege at a price that is not fixed," *id.* § 240.16a-1(c)(6). Under the SEC regulations, obtaining certain financial instruments with a fixed-ratio conversion feature thus also qualifies as a "purchase" of the security

---

[6] We also noted that "it is clear that 'logic' does not require that 'economic equivalence' be equally relevant" in answering other questions relating to the interpretation of § 16(b). *Lamb*, 363 F.2d at 524.

within the meaning of § 16(b).[7] *See id.* § 240.16b-6 (providing rules to determine the relevant transaction dates and to calculate profits with respect to transactions involving options, derivatives, and the like). Because the two securities at issue here are not convertible, however, the SEC rules are of no help to Gibbons's argument and merely reinforce our conclusion that the Series A stock and Series C stock cannot be paired under § 16(b).

## C.

Having failed to show equivalence between Discovery's Series A stock and Series C stock, Gibbons asks us to enter uncharted territory by holding that the two securities are sufficiently "similar" to be paired under § 16(b). We acknowledge the plausibility of this interpretation. As the leading academic text remarks, "§16(b) is not explicit to the effect that the purchase and sale must be of the same class, and this section *might* be applied to the purchase and sale of different 'classes' that were substantially similar." LOUIS LOSS & JOEL SELIGMAN, FUNDAMENTALS OF SECURITIES REGULATION 714 (5th ed. 2004). Nonetheless, we decline to go down this road absent SEC direction.[8]

The "substantial similarity" interpretation of § 16(b) runs into at least two obstacles. First, as we explained above, the statutory text appears to require sameness, not similarity. Thus, while we have deferred to the SEC's rules regarding convertible instruments, *see, e.g.*, *Analytical Surveys*, 684 F.3d at 48–49, in the circumstances presented we are still reluctant to venture beyond a straightforward reading of the text. Second, although we generally give ambiguous terms of § 16(b) "the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders," *Reliance Elec.*, 404 U.S. at 424, we have also explained that § 16(b) creates "mechanical requirements," *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 310 (2d Cir.

---

[7] By contrast, "[t]he acquisition of a floating-price option or convertible security is . . . not a purchase under § 16(b)." *Analytical Surveys*, 684 F.3d at 49 (citing 17 C.F.R. § 240.16a-1(c)(6)).

[8] Of course, we have no occasion to consider what effect future SEC guidance might have on the conclusions that we reach today.

1998), and is "'simple and arbitrary in its application,'" *At Home Corp.*, 446 F.3d at 409 (quoting *Whiting v. Dow Chem. Co.*, 523 F.2d 680, 687 (2d Cir. 1975)); *cf. Foremost-McKesson*, 423 U.S. at 252 ("[S]erving the congressional purpose does not require resolving every ambiguity in favor of liability under § 16(b). . . . [C]ourts should not be quick to determine that, despite an acknowledged ambiguity, Congress intended the section to cover a particular transaction."). As the Supreme Court explained in *Reliance Electric*, Congress intended for § 16(b) to be "a relatively arbitrary rule capable of easy administration," rather than one that "reach[es] every transaction in which an investor actually relies on inside information." 404 U.S. at 422. Gibbons's invitation to adopt a jurisprudence of "similarity" runs contrary to this fundamental statutory purpose. The obvious difficulty of calculating an insider's "profits" in this context further underscores the administrability concerns that a doctrine of "similarity" would create.

Undeterred, Gibbons argues that § 16(b) should apply because of the heightened degree of similarity between the two securities at issue in "*this* case," and that we need not grapple with cases that "may come along that will require a tougher call by this Court." Appellant's Reply Br. 4 (emphasis in original). This argument misses the point. Whether to adopt a similarity-based approach to the term "equity security" in § 16(b) is a threshold interpretive question of whether § 16(b) creates rules or standards. As we have already explained, § 16(b) is designed not only to stem a risk of insider abuse—which we readily acknowledge could present itself in these circumstances—but also to create *rules* that can be mechanically applied. *Cf. Gwozdzinsky*, 156 F.3d at 310 (explaining that the potential for speculative abuse in particular circumstances is insufficient to trigger liability under § 16(b)). Accordingly, the better interpretation of § 16(b) is that the statute simply does not apply to these nonpairable transactions.

Nor does the Eleventh Circuit's opinion in *Gund v. First Florida Banks, Inc.*, 726 F.2d 682 (11th Cir. 1984) cast doubt on our conclusion. That case involved an insider's sale of convertible

11

debentures and subsequent purchase of common stock using the proceeds of the sales. *Id.* at 684. Gund—the "insider"—argued that because of the structure and market prices of the respective financial instruments, his transactions "contain[ed] no potential for insider abuse." *Id.* at 686. The Eleventh Circuit found this "pragmatic" argument to be inapposite, explaining that § 16(b) "literally applies to Gund's transactions" because Gund had "stipulated to every element of section 16(b) liability." *Id.* at 687. With "no ambiguity to resolve," the Court concluded that disgorgement was required. *Id.*

The *Gund* decision is short on analysis, but the holding seems to rely on the convertibility of the instruments at issue. The Eleventh Circuit pointed out that Gund had transacted "convertible and conversion securities," *id.* at 687, and that instead of converting the debenture, Gund's transaction "involv[ed] the sale of a convertible security and the purchase of the conversion security," *id.* at 687 n.7. As best we can tell, *Gund* stands for the proposition that convertibility between financial instruments is a *sufficient* condition to make those instruments matching securities under § 16(b). Whether that proposition is good law in this Circuit is beside the point here, because the question raised in the present case is whether convertibility is a *necessary* condition for two different securities to be paired under § 16(b). In sum, *Gund* has no bearing on our resolution of this case.

## CONCLUSION

To summarize, we hold that an insider's purchase and sale of shares of different types of stock in the same company does not trigger liability under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), where those securities are separately traded, nonconvertible, and come with different voting rights.

Accordingly, the judgment of the District Court is **AFFIRMED**.

12