09-2622-cv
*Analytical Surveys, Inc. v. Tonga Partners, L.P., et al.*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2011

(Argued: January 14, 2010       Decided: June 4, 2012)
Amended: July 13, 2012

No. 09-2622-cv

———————————————————

ANALYTICAL SURVEYS, INC.,
*Plaintiff-Appellee,*

-v.-

TONGA PARTNERS, L.P., CANNELL CAPITAL,
LLC, J. CARLO CANNELL,
*Defendants-Appellants.*

———————————————————

Before:     HALL, LIVINGSTON, and CHIN[*], *Circuit Judges.*

Appeal from a judgment of the United States District Court for the Southern District of New York (Wood, *J.*), finding Defendants-Appellants ("Defendants") liable to Plaintiff-Appellee for profits of $4,965,898.95 earned in short-swing insider trading prohibited by § 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p(b), and from an order denying their motion for reconsideration. Defendants argue that the district court erred in finding the relevant transactions were "purchases" of securities for purposes of § 16(b), in finding that those transactions did not come within the scope of the "debt" and "borderline transaction" exceptions to § 16(b) liability, in rejecting Defendants' argument that the scope of any liability found should be limited to Defendant Cannell's pecuniary interest in the profits at issue, and in denying their motion for reconsideration. Finding no error in the district court's determination of liability, and no abuse of discretion in its denial of the motion for reconsideration, we AFFIRM.

———————————————————

[*] The Honorable Denny Chin was a United States District Judge for the Southern District of New York, sitting by designation, at the time of argument.

JACK FRUCHTER (Mitchell M.Z. Twersky and Ximena R. Skovron, *on the brief*), Abraham, Fruchter & Twersky, LLP, New York, NY, *for Plaintiff-Appellee*.

STEVEN M. HECHT (Sally J. Mulligan and Michael J. Hampson, *on the brief*), Lowenstein Sandler PC, Roseland, NJ, *for Defendants-Appellants*.

LIVINGSTON, *Circuit Judge*:

Defendants-Appellants Tonga Partners, L.P. ("Tonga"), Cannell Capital, LLC ("Cannell Capital"), and J. Carlo Cannell ("Cannell") (collectively, "Defendants"), appeal from a judgment of the United States District Court for the Southern District of New York (Wood, *J.*), entered June 10, 2009, holding Defendants liable to Plaintiff-Appellee Analytical Surveys, Inc. ("ASI") in the total amount of $4,965,898.95, and from a May 29, 2009 opinion and order denying Defendants' motion for reconsideration. The matter requires us, among other things, to consider the rarely-construed "debt exception" to liability under § 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78p(b) (2006), and to address the unsettled issue of the treatment of "hybrid" derivative securities under § 16(b).

Tonga, having previously invested in ASI through the purchase of a $1.7 million promissory note in 2003, exchanged that note in June 2004 for another note from ASI, with the same $1.7 million face value but somewhat different

1

terms. Both notes could be converted into shares of ASI stock at either a pre-set price-per-share or a floating price that depended on ASI's share price over a defined period prior to conversion. In November 2004, Tonga converted that note into shares of ASI stock, all of which it sold in the week following conversion. ASI, seeking to recoup the profits earned by Tonga on the sale of ASI shares, brought suit under § 16(b), which prohibits statutory insiders such as Tonga from profiting on the trade of securities on a short-swing basis (that is, from a purchase-and-sale, or sale-and-purchase, of a security in a six month period).[1]

The district court held that the note issued in 2004 was sufficiently different from the note issued in 2003 to be considered a new, rather than amended note, and thus that Tonga's acquisition of the 2004 note was a § 16(b) purchase; it further held that the conversion of that note into ASI shares five

_____

[1] Section 16(b) provides that,

> [f]or the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months, unless such security . . . was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction. . . .

15 U.S.C. § 78p(b).

months later was also a purchase under the statute, and that both of these purchases could be matched to the ensuing sale of ASI stock for purposes of disgorgement of profits earned on transactions prohibited by § 16(b). The court rejected Defendants' argument that regardless whether its transactions were covered by the § 16(b) prohibition, Defendants were shielded from § 16(b) liability by the statute's exceptions for acquisitions of securities in connection with a "debt previously contracted" and for certain "borderline transactions." The court further held that all Defendants, not merely Cannell, were liable for the profits earned on the transactions at issue.

Defendants moved for reconsideration, arguing that the district court's decision had overlooked new controlling precedent of this Court, pursuant to which their actions were sheltered by an exemption from § 16(b) liability contained in regulations issued by the Securities and Exchange Commission ("SEC"). The district court, noting that Defendants could have advanced that argument prior to the court's decision, but did not do so, denied the motion for reconsideration.

We AFFIRM the judgment of the district court on liability, and its denial of the motion for reconsideration.[2]

---

[2] We note that our decision here was significantly delayed while we awaited the issuance of opinions by other panels having precedence on a material issue in the present case. *See Huppe v. WPCS Int'l Inc.*, 670 F.3d 214 (2d Cir. 2012); *CSX Corp. v.*

## BACKGROUND

The events culminating in the present case began in 2002, when Tonga made a $2 million investment in ASI. ASI, at that time, was a provider of digital mapping services; at all times relevant to the action, it was publicly traded, and its common stock was registered pursuant to § 12 of the Exchange Act. Tonga is and was a limited partnership, created by Defendant-Appellant Cannell as an investment vehicle for himself and other private investors. At all relevant times, Tonga's sole general partner was Defendant-Appellant Cannell Capital; Cannell was the sole managing member of Cannell Capital, and, working through Cannell Capital, he in turn directed and controlled the operation of Tonga.

In April 2002, Tonga paid ASI $2 million to acquire a senior secured convertible promissory note with a maturity date in April 2005 (the "2002 Note"). Under the 2002 Note's terms, at any time prior to the maturity date, Tonga could convert part or all of the Note's principal (and accrued interest) into shares of ASI common stock; the number of shares received for a given amount of principal-and-interest depended on the price per share, as determined by a conversion formula in the Note. That formula, in turn, defined the conversion price per share as the least of a fixed price (either $0.40 or $2.00, depending on the timing of the conversion) and two possible floating prices (each based on

_____

*Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276 (2d Cir. 2011).

4

ASI's average stock price in certain defined periods prior to conversion).[3] Section 3.5 of the Note provided that, at maturity, the outstanding balance of the Note would automatically be converted into shares, based on the conversion price on the maturity date.[4]

Simultaneous to the acquisition of the 2002 Note, Tonga and ASI also entered into an agreement (the "Registration Rights Agreement") by which ASI was obligated to file a registration statement with the SEC for the shares acquirable by conversion of the Note, and then to have that statement declared effective, within a certain period of time.[5] Failure to have the statement declared effective within the specified period (150 days after its filing with the SEC) constituted an Event of Default under § 2.1(c) of the Note.

---

[3] The conversion price was defined as "the lesser of (i) the Closing Price . . . and (ii) ninety percent (90%) of the average of the Per Share Market Value of the Common Stock for the three (3) Trading Days having the lowest Per Share Market Value during the twenty (20) Trading Days immediately prior to the Voluntary Conversion Date or the Mandatory Conversion Date [the maturity date]." 2002 Note § 3.2(a). The Closing Price was defined as "the lesser of (i) $.40 if the Reverse Stock Split is not effected prior to the Closing Date or $2.00 if the Reverse Stock Split is effected prior to the Closing Date and (ii) ninety percent (90%) of the average Per Share Market Value of the Common Stock for the ninety (90) Trading Days immediately prior to the Closing Date." 2002 Note § 3.2(b). The Reverse Stock Split referred to in this provision occurred in October 2002.

[4] As a security with both a fixed and a floating exercise price, the Note is considered a "hybrid" security for purposes of § 16(b). *See* Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide* § 10.04[5][b][iii], at 995 (3d ed. 2008).

[5] Additionally, in conjunction with its acquisition of the Note, Tonga was given the right, which it exercised, to appoint a majority of ASI's Board of Directors; the Tonga-designated directors remained on the Board at all times relevant to this appeal.

5

As relevant here, if a § 2.1(c) default occurred, § 2.2 of the Note gave Tonga the option to, at a time of its choosing, (1) accelerate the entire unpaid principal balance of the Note (rendering that balance immediately due and payable); or (2) demand prepayment of at least 130% of the principal amount of the Note; or (3) demand that the outstanding principal (and accrued interest) be converted into shares, with the default date serving as the date of conversion for purposes of the conversion price. Alternatively, if Tonga did not wish to exercise one of these options, it was free to ignore the Event of Default and proceed as otherwise provided for by the terms of the Note.

In October 2003 Tonga converted $300,000 of the 2002 Note into approximately 260,000 shares of ASI common stock, at a price, determined under one of the floating-price provisions of the Note, of $1.24 per share.[6] At the same time, ASI issued an amended convertible note to Tonga on the same terms as before, now in the amount of $1.7 million (the "2003 Note"). By the time the 2003 Note issued, the deadline for ASI to file a registration statement had been moved back, under various amendments to the Registration Rights Agreement, to December 31, 2003;[7] ASI was therefore obligated under the Note to have said statement declared effective by the SEC by the end of May 2004.

---

[6] As a result of the October 2003 conversion, Defendants held approximately 18.6% of ASI's outstanding common stock as of February 2004.

[7] ASI filed the registration statement on December 29, 2003.

No declaration of effectiveness issued, however. On May 28, 2004, 150 days having passed after the filing of ASI's registration statement with the SEC, an Event of Default was triggered under § 2.1(c) of the 2003 Note. Tonga did not, however, exercise any of the remedies available to it under § 2.2.[8] Rather, following negotiations between ASI and Tonga, ASI issued another note to Tonga in the amount of $1.7 million on June 30, 2004 (the "2004 Note").[9] The 2004 Note carried a maturity date of January 2, 2006 (rather than the previous maturity date of April 2, 2005). The 2004 Note also eliminated the mandatory conversion required by the 2002 and 2003 Notes; at maturity, Tonga now had the *option* to convert the principal balance into shares, but could, if it wished, insist on payment in full in cash.[10]

On November 10, 2004, Tonga converted the outstanding principal of the 2004 Note ($1.7 million) into 1,701,341 shares of common stock at the applicable floating price of $1.05 per share. Between November 10 and November 15, 2004, Tonga sold all 1,701,341 shares of that stock in the open market, at prices ranging from $3.52 to $6.62 per share.

---

[8] The parties agree that had Tonga, pursuant to § 2.2, chosen to demand payment in cash of the outstanding balance of the Note, the demand would likely have driven ASI into bankruptcy.

[9] The parties dispute whether the 2004 Note is a new note, or merely an amended version of the 2003 Note. *See infra* Part IV.

[10] Though the record is not entirely clear on this point, the parties agree on appeal that the 2004 Note used the same conversion formula as the 2003 Note.

On April 6, 2006, ASI filed an action in the United States District Court for the Southern District of New York, seeking disgorgement under § 16(b) of the Exchange Act of the profits earned by Tonga on its November 2004 sale of ASI shares. In response, Tonga argued that its acquisition of the 2004 Note in June 2004, and its conversion of that Note in November 2004, did not constitute purchases of stock such that the ensuing sale of shares came within the prohibition of § 16(b). Tonga also argued that the November 2004 sale fell within § 16(b)'s "debt previously contracted" exemption from liability, and the "borderline transaction" exception to liability of *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973). Finally, Tonga maintained that even if liability were appropriate, ASI could obtain disgorgement only to the extent of Cannell's *personal* interest in the profits earned in November 2004, and not any additional profits realized by Cannell Capital and Tonga.

On opposing motions for summary judgment, the district court (Wood, *J.*) rejected each of these arguments and denied Tonga's motion in its entirety. Instead, on September 26, 2008, the district court granted summary judgment in part to ASI, and ordered Tonga to disgorge $4,965,898.95 in profits, with Cannell and Cannell Capital jointly and severally liable for their respective pecuniary interests in those profits. *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, No. 06-2692, 2008 WL 4443828 (S.D.N.Y. Sept. 29, 2008). The district

8

court, however, denied summary judgment as to the precise amounts of the pecuniary interests of Cannell and Cannell Capital. *Id.* at \*\*13-16.

On November 20, 2008, the district court "so ordered" a stipulation between the parties, both as to the amounts of Cannell's and Cannell Capital's pecuniary interests and that in light of agreement on these amounts, that entry of judgment in favor of ASI was therefore warranted;[11] Defendants reserved their right to contest the findings of fact and conclusions of law in the district court's opinion and order of September 26. On November 25, 2008, Defendants moved for reconsideration of the September 26 summary judgment decision, arguing that this Court had issued new precedent that made clear that Defendants were shielded from liability under § 16(b) by certain of the SEC's implementing regulations. The district court denied the motion for reconsideration on May 29, 2009. *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, No. 06-2692, 2009 WL 1514310 (S.D.N.Y. May 29, 2009). An amended judgment was entered on June 10, and this appeal followed.

---

[11] The district court entered judgment on December 1.

## DISCUSSION

### *I. Section 16(b)*

Section 16(b) of the Exchange Act requires statutory insiders—those with a beneficial ownership interest of more than 10% in an equity security—to disgorge all profits realized from any purchase and sale (or sale and purchase) of the same security made within a six month period. The Exchange Act defines "purchase" and "sale" broadly, *see* 15 U.S.C. § 78c(a)(13)-(14), and we have said that § 16(b) applies to "acquisitions and dispositions of equity securities in transactions such as conversions, options, stock warrants, and reclassifications," *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 218 (2d Cir. 2012) (citing *Blau v. Lamb*, 363 F.2d 507, 516 (2d Cir. 1966)).

The statute "imposes liability without fault" for all transactions within its terms, *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976), "to remove any temptation for insiders to engage in transactions" that would enable "the realization of short-swing profits based on access to inside information," *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998) (quoting *Kern County*, 411 U.S. at 594) (internal quotation marks omitted). Section 16(b) thus "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power*, 136 F.3d at 320-321. This

"blunt instrument" approach, *Huppe*, 670 F.3d at 218 (internal quotation marks omitted), is leavened only by limited exceptions—the "debt" and "borderline transaction" exceptions—for transactions otherwise subject to disgorgement. In our *de novo* review of the district court's grant of summary judgment, *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 113 (2d Cir. 2011), we begin by considering whether Defendants' actions were within the scope of either (or both) of these exceptions, as suggested by *Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 206 n.6 (2d Cir. 2006).

## II. The "Debt Exception"

Section 16(b) states that its prohibition does not apply to transactions involving a security that "was acquired in good faith in connection with a debt previously contracted." Tonga contends that this "debt exception" applies here because it acquired the 2004 Note from ASI in satisfaction of the debt ASI owed as a result of ASI's default on the 2003 Note. We are not persuaded.[12]

Though jurisprudence on the contours of the debt exception is sparse, certain principles may be gleaned from the existing precedents. For a transaction to qualify for the debt exception, the debt at issue must constitute

---

[12] ASI maintains that this argument is an affirmative defense that Tonga waived by not raising it until Tonga's motion for summary judgment. The district court did not reach this issue given its analysis of the debt exception on the merits, and neither do we.

"an obligation to pay a fixed sum certainly and at all events," *Rheem Mfg. Co. v. Rheem*, 295 F.2d 473, 476 (9th Cir. 1961), and be a "matured debt[] which existed apart from any existing obligation to transfer the securities," *Heli-Coil Corp. v. Webster*, 352 F.2d 156, 168 (3d Cir. 1965) (citing *Booth v. Varian Assocs.*, 334 F.2d 1, 5 (1st Cir. 1964)); *accord* Romeo & Dye, §§ 13.09[4], at 1279. Here, the debt exception does not apply because, at minimum, the 2004 Note was not acquired in connection with a matured debt.[13]

At the outset, the 2003 Note provides, and the parties do not dispute, that it is governed by the internal law of New York. Neither § 16(b) itself nor the extant precedents on the debt exception provide a source of law for determining whether a debt is "matured." In "giving content" to this aspect of the § 16(b) inquiry for purposes of federal law, we adopt state law as providing the appropriate rule of decision. *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 206 (2d Cir. 2006) (Sotomayor, *J.*) (quoting *United States v. Kimbell Foods, Inc.*,

---

[13] ASI suggests for the first time on petition for rehearing that interpreting the debt exception to shield only transactions relating to securities acquired in connection with matured debts conflicts with the Supreme Court's directive in *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 251-252 (1976), that § 16(b) should be construed narrowly. Pet. for Rehearing 11-12. We do not agree. The issue in *Foremost-McKesson* concerned the definition of "beneficial owner" in § 16(b)—that is, the scope of the statute's prohibition on short-swing trading. Here, however, the debt exception, if applicable, would preclude liability even if the transactions at issue were otherwise prohibited short-swing trades, which is why our analysis here begins with that exception. That the scope of § 16(b)'s prohibition should be construed narrowly does not, in our view, suggest that § 16(b)'s exemptions for certain conduct *within* that scope must be construed broadly.

440 U.S. 715, 728 (1979)). We thus look to New York law in assessing whether the debt owed to Tonga by virtue of ASI's default on the 2003 Note had matured and was legally enforceable at the time the 2004 Note was issued.

The 2003 Note specifies a maturity date of April 2, 2005, absent an extension of that date, or other specific provision in the Note. Tonga contends, nonetheless, that the debt owed pursuant to the 2003 Note was mature and legally enforceable when ASI issued the 2004 Note (in June of that year), because of the consequences of the May 2004 Event of Default. Accordingly, Tonga concludes that it acquired the 2004 Note "in connection with a debt previously contracted" for the purpose of § 16(b).

It is true that under New York law, "[t]he parties to a loan agreement are free to include provisions directing what will happen in the event of default . . . of the debt, supplying specific terms that super[s]ede other provisions in the contract if those events occur." *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 262 (2011). And if the agreement's terms require the acceleration of the debt upon default, that acceleration "changes the date of maturity from some point in the future . . . to an earlier date based on the debtor's default under the contract." *Id.* In this case, however, as earlier described, the terms of the Note did *not* require acceleration upon the type of default present here. Rather, they *permitted* acceleration, on demand, as one of several possible options available

13

to Tonga, including demanding prepayment of at least 130% of the Note's principal amount and conversion of the Note at a share price tied to the date of default; the availability of these options did not displace the Note's pre-existing provisions for conversion at Tonga's option or at maturity. It is undisputed, moreover, that Tonga never demanded acceleration or prepayment of the 2003 Note. As such, the Note's maturity date continued to be April 2, 2005, and the Note was not a matured debt in June 2004.

Tonga argues that such a conclusion exalts form over substance. But the 2003 Note itself treats the distinction between automatic acceleration and optional acceleration as meaningful. Section 2.2, defining the remedies available upon an Event of Default, expressly distinguishes between certain categories of default, which render "the outstanding principal balance and accrued interest . . . *automatically* due and payable," from other categories—including the type of default that occurred here—in the event of which the Note's principal and accrued interest "shall be accelerated and so due and payable" *only at the option of the holder*. Interpreting the permissive remedy applicable here as if it were a mandatory remedy would read this distinction out of the Note, and fail to give effect to "the language chosen by the parties in the . . . agreement," *NML Capital*, 17 N.Y.3d at 263.

We decline to so depart from the Note's clear meaning. In the absence of a demand by Tonga for acceleration or prepayment following the May 2004 default, the obligation of the 2003 Note had not matured at the time that ASI issued the 2004 Note, and the acquisition of the 2004 Note was therefore not made "in connection with a debt previously contracted" for the purpose of § 16(b).[14] The district court did not err in rejecting Tonga's argument that the debt exception was applicable here.

## III. The "Borderline Transaction" Exception

As recognized by the Supreme Court in *Kern County v. Occidental Petroleum Corp.*, § 16(b)'s otherwise-categorical prohibition contains a limited exception for certain "borderline transactions" that do not "serve as a 'vehicle for the evil which Congress sought to prevent — the realization of short-swing profits based upon access to inside information.'" *Huppe*, 670 F.3d at 218 (quoting *Kern County*, 411 U.S. at 593-594 & n.26). We have suggested on several occasions, however, that *Kern County* only applies when the transaction at issue is "an [1] involuntary transaction by an insider [2] having no access to

---

[14] We thus do not address whether the 2004 Note was acquired in good faith for purposes of § 16(b), or whether the debt at issue was independent of ASI's existing obligation to transfer stock to Tonga. Nor do we decide whether, if the debt exception *did* apply to Tonga's acquisition of the 2004 Note, the shares obtained through the November 2004 conversion of that Note were also "securit[ies] acquired in connection with a debt previously contracted."

inside information." *Id.* at 218-219 (quoting *At Home Corp. v. Cox Commc'ns, Inc.*, 446 F.3d 403, 408 (2d Cir. 2006)) (internal quotation marks omitted).

Here, Tonga does not contend that it lacked inside information. Rather, it argues that the *Kern County* inquiry is not limited in this Circuit "to involuntary transactions where the statutory insider did not have access to insider information." Appellant's Br. 40. Tonga urges that even assuming it *had* access to such information, it was "impossible for [Tonga] to gain any speculative advantage" from inside information, because its acquisition of the 2004 Note "was the product of direct negotiations between ASI and [Tonga]" in which "ASI and its board had access to the same information" as Tonga, "and was approved by ASI's board of directors," Appellants' Br. 39.

We disagree. In *Huppe*, this Court *specifically* rejected the argument that a transaction should be exempted from § 16(b) pursuant to the borderline transaction exception because "it was the product of direct negotiations between [a company] and [an insider] and [was] approved by [the company's] board of directors." 670 F.3d at 218. We repeated yet again our suggestion that both an involuntary transaction and lack of access to inside information are prerequisites to the *Kern County* analysis, and added, "we have been clear that Section 16(b) should be applied without further inquiry if there is 'at least the possibility' of speculative abuse of inside information," *id.* at 219 (citing *Blau*, 363 F.2d at 519).

16

*Huppe* also made clear that, contrary to Tonga's assertion, our decision in *Roth* ex rel. *Beacon Power Corp. v. Perseus, L.L.C.*, 522 F.3d 242 (2d Cir. 2008) (Parker, *J.*), upholding SEC rules exempting certain insider-issuer transactions from § 16(b) liability "does not mean" that we believe such "transactions lack *any* risk of speculative abuse, such as the possible exploitation of information asymmetry," or that "*every* issuer-insider transaction is invulnerable to information asymmetry." *Huppe v. WPCS Int'l, Inc.*, 670 F.3d 214, 220 (2d Cir. 2012) (Parker, *J.*) (first emphasis added). Rather, *Perseus* merely gave *Chevron* deference to the SEC's position that such transactions bear a substantially *diminished* risk of speculative abuse, *see Perseus* SEC Amicus Brief at 18-19, and thus come within the SEC's "broad exemptive authority under the statute" even if some possibility of abuse remains, *Huppe*, 670 F.3d at 220. Tonga has not shown that in this case the possibility of abuse was not simply diminished but nonexistent.

Nor has Tonga cited any authority drawing into question this understanding of *Kern County* and the borderline transaction exception. Two of the three cases on which Tonga relies in fact specifically concluded that the statutory insiders in question lacked the access to inside information that Tonga possessed here. *See Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 126

(2d Cir. 2002); *C.R.A. Realty Corp. v. Crotty*, 878 F.2d 562, 567 (2d Cir. 1989).[15]
And in the third decision, *At Home v. Cox Communications*, we noted that *Kern County* presented a borderline case in part because it involved an insider who was "atypical" because it "lacked access to inside information," 446 F.3d at 408; we emphasized, moreover, that the *Kern County* borderline transaction approach does not control cases involving "a garden-variety insider" who had such access, *id.*; *accord Huppe*, 670 F.3d at 218-219. Because Tonga, like the insiders in *At Home* and *Huppe*, had access to inside information about ASI, its acquisition of the 2004 Note cannot come within the borderline exception.[16]

## *IV. Acquisition of the 2004 Note*

Since neither the debt exception nor the borderline transaction exception to liability are applicable here, we turn next to whether the district court erred in concluding that Tonga's acquisition of the 2004 Note and its later conversion of that Note into shares constituted "purchases" that should be matched to Tonga's November 2004 sale of ASI stock for the purpose of § 16(b). We begin, however, by examining whether the 2004 Note was in fact a "new" note, or, like

---

[15] As well, *Crotty* was a case about the meaning of "officer" for purposes of delineating the contours of the § 16(b) prohibition, not about the scope of the "borderline transaction" exception to the otherwise-applicable prohibition. 878 F.2d at 563.

[16] We do not reach the issue of whether the acquisition of the 2004 Note was "involuntary" within the meaning of our borderline transaction precedents.

the 2003 Note, merely an amended version of the 2002 Note. ASI does not dispute that if it were the latter, the acquisition of the 2004 Note could not be considered a § 16(b) purchase.

As discussed above, the terms of the 2004 Note differed from those of the 2003 Note in (1) extending the Note's maturity date from April 2, 2005 to January 2, 2006; and (2) eliminating the requirement that the principal be converted into shares at maturity. We consider whether these differences were sufficiently material that the later Note constituted a newly-issued, rather than amended security. *See* Romeo & Dye, § 3.03[6], at 276-277.

Tonga argues that the changes in terms should not be deemed material because, in the particular circumstances present here, Tonga could not possibly have gained any speculative advantage from its access to inside information at the time that the changed terms of the 2004 Note were negotiated and the 2004 Note issued. But even indulging the assumption that a case-by-case examination of the possibility of speculative abuse of inside information is appropriate in this context, Tonga frames the inquiry incorrectly.

In emphasizing the potential for abuse of inside information as of June 2004, Tonga looks only to whether the 2004 Note (and the changed terms thereof) provided a greater opportunity for short-swing trading and profit *at acquisition*. But our inquiry is not limited to whether the 2004 Note enhanced

Tonga's ability to abuse inside information merely when Tonga acquired the Note; such an approach inappropriately disregards the possibility of abuse of inside information in deciding whether and when to convert the Note once acquired.

Nor do we look only to whether the new terms would have made more likely that possibility in the six months following Tonga's acquisition of the 2004 Note. The six-month clock would only be relevant if, at *this* stage of the inquiry, we were to treat the acquisition of the Note as a § 16(b) purchase. True, that the acquired security be newly-issued is necessary for the acquisition to be a purchase; but, as discussed in Part V, *infra*, some acquisitions of newly-issued securities are nonetheless *not* § 16(b) purchases. Whether the security is newly-issued is logically and legally distinct from whether acquiring such a security constitutes a purchase. Here, we defer the latter question for the moment, and consider simply whether the June 2004 transaction at issue was an acquisition of a newly-issued, rather than amended security. And for that purpose, the relevant question is whether the changed terms in the 2004 Note gave Tonga a greater opportunity to abuse inside information in short-swing trading at *any* time from acquisition in June 2004 to maturity in January 2006.

Considered from that standpoint, we agree with the district court's view that the changes made from the 2003 Note to the 2004 Note were material. The

changes allowed Tonga more time—from April 2, 2005, when the 2003 Note was to mature, until January 2006—within which to use inside information in determining whether (and when) to convert the Note into shares; Tonga could, in fact, choose to wait until the maturity date itself to make that call, if need be, because the 2004 Note lacked the mandatory conversion element of the previous Note.[17] Moreover, at maturity, the elimination of that mandatory conversion provision gave Tonga latitude to use inside information to determine whether it could realize a greater return from taking the principal balance in cash or from converting that principal into shares for later sale.[18] Thus, even on Tonga's preferred case-by-case approach, the terms of the 2004 Note were materially altered from those of the 2003 Note, such that Tonga acquired a new security in June 2004.

---

[17] As the district court noted, *Analytical Surveys,* 2008 WL 4443828 at *8, the SEC has previously taken the position, in a formal release interpreting an earlier version of Rule 16b-3, that "an extension of an option exercise period is deemed to be a redemption of an old security and grant of a new security for purposes of Section 16." Ownership Reports and Trading By Officers, Directors and Principal Security Holders, Exchange Act Release No. 29,131, 1991 WL 292345, at *4 n.35 (Apr. 26, 1991) (citation omitted). We see no reason (and Tonga does not attempt to provide one) why a convertible note should be treated differently in this respect from an option for purposes of § 16(b).

[18] To be sure, since Tonga converted the 2004 Note five months before the 2003 Note would have matured in April 2005, that conversion did not exploit the greater opportunities for speculative abuse that were created by the changes in terms from the 2003 to 2004 Note. But the fact that Tonga did not take advantage of those opportunities does not mean they did not exist.

## V. Section 16(b) and "Hybrid" Derivative Securities

To be clear, the mere fact that Tonga acquired a new convertible note in June 2004 does not, in itself, mean that this acquisition was a purchase for the purpose of § 16(b). Although we do conclude that it was, explaining this conclusion requires delving into the intricacies of the regulatory treatment of derivative securities under § 16(b) and, in particular: (1) the different treatment afforded to convertible securities providing an option to acquire shares at a fixed price and securities providing an option to acquire at a floating price; and (2) the treatment of hybrid securities.

A. Regulation of Derivatives for Purposes of § 16(b)

Derivative securities are "financial instruments that derive their value (hence the name) from an underlying security or index." *Magma Power*, 136 F.3d at 321. For purposes of § 16(b), derivatives are governed chiefly by regulations adopted by the SEC in 1991. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 28,869, 1991 WL 292000 (Feb. 8, 1991) ("Release No. 28,869"). These regulations apply broadly, defining "derivative securities" as "any option, warrant, *convertible security*, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security." Exchange Act Rule 16a-1(c),

17 C.F.R. § 240.16a-1(c) (2011) (emphasis added). Underlying the derivative regulations is the SEC's "recogni[tion] that holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16, since the value of the derivative securities is a function of or related to the value of the underlying equity security." Release No. 28,869, 1991 WL 292000, at *11.

For § 16(b) purposes, acquiring a derivative security that gives the holder the option to purchase shares at a fixed price or to convert into shares at a fixed price is treated as equivalent to purchasing the shares directly.[19] Thus, the SEC's regulations treat "the *acquisition* of a fixed-price option — rather than its *exercise* — [as] the triggering event" for § 16(b) purposes. *Magma Power*, 136 F.3d at 321-322.[20] This is because the "'insider's opportunity to profit' by access to nonpublic information 'commences . . . when the insider engages in options or other derivative securities that provide an opportunity to obtain or dispose of the stock at a fixed price.'" *Magma Power*, 136 F.3d at 322 (quoting Release No. 28,869, 1991 WL 292000, at *11) (omission in original). "In essence, an insider

---

[19] The same is true of derivative securities that give the holder the right to *sell* shares at a fixed price, *see Magma Power*, 136 F.3d at 321-324, though such securities are not at issue in this case and we therefore do not address them here.

[20] Rule 16b-6(a) provides that "[t]he establishment of or increase in a call equivalent position [which includes an option to purchase at a fixed price] . . . shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Act." 17 C.F.R. § 240.16b-6(a) (2011).

who takes an option position is making a bet on the future movement of the price of the underlying securities; the odds in the insider's favor are foreshortened if the wager is backed by inside information." *Id.* In such circumstances, "inside information may be advantageous" at the time of "the acquisition . . . of the option," *id.*, which is why the SEC rules regard acquisition of a fixed-price option as the relevant § 16(b) event.[21]

The rules are quite different, however, for options, convertible securities, and the like that allow the purchase of shares at a *floating* price. Rule 16a-1(c)(3) excludes "[r]ights with an exercise or conversion privilege at a price that is not fixed" from the definition of "derivative security." 17 C.F.R. § 240.16a-1(c)(6) (2011). The acquisition of a floating-price option or convertible security is therefore not a purchase under § 16(b). This is because acquisition of such an option "do[es] not provide an insider the same kind of opportunity for short-swing profit since the purchase price [of the underlying security] is not known in advance. The opportunity to lock in a profit [only] begins when the exercise price is fixed; at *that* time, the right becomes a derivative security

---

[21] By the same logic, the rules treat "the exercise of a fixed-price option as nothing more than a change from an indirect form of beneficial ownership of the underlying securities to a more direct one," *Magma Power*, 136 F.3d at 322, because, by that point, "the insider . . . is already bound by the terms of the option," and the "potential for abuse of inside information is minimal," *id.* "[T]he acquisition of underlying securities at a fixed exercise price due to the *exercise or conversion* of a call equivalent position . . . shall be exempt from the operation of section 16(b) of the Act." Rule 16b-6(b), 17 C.F.R. § 240.16b-6(b) (2011) (emphasis added).

subject to Section 16." Release No. 28,869, 1991 WL 292000, at \*17 (emphasis added). Thus, "because only at exercise is the price fixed and, therefore, the extent of the profit opportunity defined," *id.* at \*18 n.148, "a right with a floating exercise price . . . will not be deemed to be acquired or purchased, for Section 16 purposes," *id.* at \*18, until exercise or conversion.

B. The Proper § 16(b) Approach to "Hybrid" Derivatives

The SEC's complementary approach to fixed and floating-price options and convertibles is (comparatively) straightforward. The treatment of a hybrid security with both fixed *and* floating-price features (such as presented in this case) presents more complications. In this context, we have said, the regulatory "mechanism has wheels within wheels." *At Home*, 446 F.3d at 407. It is at least evident under our decision in *At Home* that a hybrid security exercised at a fixed price is properly treated as though it were solely a fixed-price option, making the timing of acquisition the only relevant transaction for purposes of the § 16(b) six-month clock. *See id.* at 405-408. But precisely because *At Home* dealt with a hybrid exercised at the fixed price, it had no occasion to address hybrids exercised at a *floating* price, *id.* at 407 n.3, the situation presented here.

District courts in this Circuit have taken varying approaches in this situation. One view is that a hybrid exercised at a floating price is dealt with as if it were a fixed-price security, such that its acquisition is a cognizable § 16(b)

purchase, while "conversion[] . . . [is a] non-event[] for purposes of" the statute. *Lerner v. Millenco, L.P.*, 23 F. Supp. 2d 337, 342 (S.D.N.Y. 1998); *see id.* at 342-343. The district courts taking this approach reason that "where there is a hybrid conversion privilege . . . the fixed price has enabled the investor who has received inside information to lock [in] his position with a minimum number of shares, and, thereby, realize a minimum profit." *Levy v. Oz Master Fund, Ltd.*, No. 00-7148, 2001 WL 767013, at *7 (S.D.N.Y. July 9, 2001). Given this baseline, as "the *Lerner* court found, . . . the investor's position and his potential for profit . . . can only be enhanced by the operation of the floating component," *id.* at *8, and the investor's knowledge of these facts "creates an incentive to conduct short-swing transactions on the basis of inside information," *id.*

The *Lerner* and *Oz* courts were rightly concerned at the prospect of deeming acquisition irrelevant to § 16(b) if exercise occurs at the floating price. *Cf. Levy v. Clearwater Fund IV Ltd.*, No. 99-004, 2000 WL 152128 (D. Del. Feb. 2, 2000) (treating a hybrid security exercised at a floating price as containing only a floating-price component). But the method of these decisions runs counter to our statement in *Magma Power* that where a security "contain[s] two options: a fixed price option . . . and a floating price option," the "better approach is to treat . . . each option" as "analytically distinct," and consider them each in turn. 136 F.3d at 324.

In particular, the *Lerner/Oz* view, though accounting for the potential abuse of inside information to lock in a minimum number of shares (and thus a minimum opportunity for profit), ignores an insider's *additional* opportunity to rely on inside information to time the date of exercise or conversion, so as to maximize the number of shares obtained above the minimum-share baseline set at acquisition. True, after acquisition, the investor's potential for profit "can only be enhanced by the operation of the floating price component," *Oz*, 2001 WL 767013 at *8; but that is little reason to think the floating component *irrelevant*. Section 16(b) was, as we have said, "intended to be thoroughgoing, to squeeze *all* possible profits out of stock transactions" carried out on inside information, *Smolowe v. Delendo Corp.*, 136 F.2d 231, 239 (2d Cir. 1943) (emphasis added), not merely minimum guaranteed profits.

We thus prefer the approach taken by the district courts in *Schaffer* ex rel. *Lasersight Inc. v. CC Invs., LDC*, 280 F. Supp. 2d 128 (S.D.N.Y. 2003), *At Home Corp. v. Cox Commc'ns, Inc.*, 340 F. Supp. 2d 404 (S.D.N.Y. 2004), and the present case, *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 2008 WL 4443828. Under this "bifurcated" approach, the acquisition of a hybrid instrument that allows for the purchase of shares constitutes a § 16(b) purchase of the minimum number of shares that could be acquired if exercise were at the fixed price; conversion of the instrument at a lower floating price is a separate § 16(b)

purchase of any additional shares acquired based on the difference between the fixed price and the floating price. But, as discussed above, *see supra* at 24 n.17, conversion at the fixed price is *not* an additional purchase for § 16(b) purposes.[22]

Here, for example, it is undisputed that the 2004 Note had a principal of $1,700,000, that the applicable fixed price at acquisition was $2.00, and that Tonga converted the 2004 Note into a total of 1,701,341 shares. Thus, the district court correctly held that acquisition of the Note on June 30, 2004, constituted a § 16(b) purchase of 850,000 shares of ASI stock, and conversion of the Note on November 10, 2004, constituted a § 16(b) purchase of 851,341 additional shares. Both of these purchases are matchable under § 16(b) with Tonga's sale of 1,701,341 shares of ASI stock between November 10 and November 15, 2004. The district court, applying the § 16(b) principle of "lowest price in, highest price out," *Smolowe*, 136 F.2d at 239, concluded that Tonga realized disgorgeable profits on its sale of ASI stock of $4,965,898.95. Defendants do not contest these calculations on appeal, and we therefore take them as correct.[23]

---

[22] An analogous approach would also apply to the acquisition (and later exercise) of a hybrid instrument that allows for the *sale* of shares. We note that since the 2004 Note was a "new" rather than amended note, Tonga made a § 16(b) purchase within six months of a matchable sale under either the *Lerner/Oz* view or *Schaffer*'s bifurcated approach to hybrid derivative securities and is thus subject to disgorgement of profits regardless, though the size of that disgorgement obligation would be substantially smaller under *Lerner/Oz*.

[23] Neither party challenges the district court's decisions on pre-judgment and post-judgment interest, and we do not address them here.

## VI. Beneficial Ownership

Defendants argue, next, that even assuming, as we have held, that a § 16(b) purchase-and-sale requiring disgorgement occurred, disgorgement should be limited to Cannell's pecuniary interest in the profits realized from the transactions at issue. On their view, because Tonga and Cannell Capital delegated sole voting and investment power to Cannell, under § 16(b)'s implementing regulations he was the sole "beneficial owner" of the securities purchased and sold by Tonga, and thus the sole party subject to disgorgement. Again, we disagree.

This position is foreclosed by our recent decision in *Huppe v. WPCS International*. In *Huppe*, as here, defendants included limited partnerships that vested exclusive management and control of the partnerships' investment decisions to their respective general partners, which in turn delegated that power over investments to two individuals. 670 F.3d at 216. Faced with a § 16(b) lawsuit, the defendants in *Huppe* argued that given this delegation of authority, the limited partnerships could not be "beneficial owners" for § 16(b) purposes. *Id.* at 221. We held that this "inventive" argument could not be "squared with basic principles of agency law," would "be inconsistent with the text and purposes of Section 16(b), and if accepted, would seriously weaken the provision." *Id.* at 221, 222. We concluded that the limited partnerships there

were indeed beneficial owners under § 16(b), and thus subject to disgorgement. *Id.* at 222.

We see no distinction between *Huppe* and the present appeal. Tonga, like the defendants in *Huppe*, is a limited partnership organized under the laws of Delaware, under which Cannell Capital, as Tonga's general partner, has the authority to delegate its power to manage and control the affairs of Tonga to Cannell. *See Huppe*, 670 F.3d at 221 (citing Del. Code Ann. Tit. 6 §§ 15-301(a), 17-403(a), (c)). Defendants do not argue that the particular terms of Tonga's partnership agreement restricted this statutorily-conferred authority.

As for Cannell Capital, it is true that no intermediate general partners were defendants in *Huppe*. But it is undisputed that Cannell held a 99.9% ownership interest in Cannell Capital, was sole managing member of the company, and enjoyed full control over its operations. Defendants do not attempt to argue that Cannell nonetheless somehow lacked authority to bind Cannell Capital by his actions. Cannell Capital is thus responsible for the actions of Cannell as its agent, just as Tonga is responsible for the actions of Cannell Capital (carried out here by Cannell) as Tonga's agent. Under *Huppe*, therefore, both Cannell Capital and Tonga are "beneficial owners" for § 16(b) purposes, and therefore subject to disgorgement of the profits realized here by Tonga.[24]

---

[24] Per the judgment of the district court entered June 10, 2009, as it incorporates the stipulation of the parties, Defendants are jointly and severally liable to ASI for

*VII. Motion for Reconsideration*

Defendants maintain, finally, that the district court abused its discretion in denying their motion for reconsideration, though the argument forming the basis of this claim was not raised prior to that motion for reconsideration. "It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple' . . . ." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). Rather, "the standard for granting [a Rule 59 motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Denials of motions for reconsideration are reviewed only for abuse of discretion. *Empresa Cubana del Tabaco v. Culbro Corp.*, 541 F.3d 476, 478 (2d Cir. 2008) (per curiam).

Here, Defendants argue on appeal that the district court erred by declining to reconsider its grant of summary judgment for plaintiffs in light of our decision in *Roth* ex rel. *Beacon Corp. v. Perseus, L.L.C.*, 522 F.3d 242 (2d Cir. 2008).

their respective pecuniary interests in Tonga's short-swing profits, in the amounts of $4,965,898.95 (Tonga), $553,896.37 (Cannell Capital), and $553,342.47 (Cannell), though total recovery shall not exceed $4,965,898.95 plus post-judgment interest and any costs.

*Perseus* held that the exemption (under Rule 16b-3) of issuer-director transactions from the restrictions of § 16(b) included issuer—director-by-deputization transactions. Defendants maintain that Tonga was, at the relevant time, a director by deputization of ASI, and thus that the acquisition and conversion of the 2004 Note was exempted by Rule 16b-3. They did not, however, raise such arguments in the district court prior to judgment, though such arguments were not foreclosed by any precedent of this Court.

Further, though Defendants emphasize that we issued our decision in *Perseus* after the completion of briefing below on the parties' motions for summary judgment, *Perseus* came down more than five months *before* the district court granted summary judgment in part to ASI. Defendants, though communicating with the district court regarding other pending § 16(b) cases in that period, made no attempt to call the court's attention to *Perseus*, or in any other way suggest that they believed themselves exempted from § 16(b) by Rule 16b-3, prior to the district court's grant of partial summary judgment. We conclude that the district court's denial of the motion for reconsideration was not an abuse of discretion.

Finally, we "[g]enerally[] will not consider an argument on appeal that was raised for the first time below in a motion for reconsideration," though this is a prudential rather than jurisdictional rule. *Official Comm. of the Unsecured*

32

*Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 159 (2d Cir. 2003). We "are more likely to exercise our discretion" to consider an "issue[] not timely raised below" when "the issue is purely legal and there is no need for additional fact finding." *Id.* Here, however, Defendants argue that Tonga was a director by deputization, which the Supreme Court has "intimated . . . is a question of fact to be settled case by case and not a conclusion of law," *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969) (citing *Blau v. Lehman*, 368 U.S. 403, 408-409 (1962)). And though we express no opinion on the ultimate merits of this question as pertaining to Tonga, we are skeptical that on these facts its "proper resolution is beyond any doubt" as a matter of law, *Color Tile*, 322 F.3d at 159 (quoting *Singleton v. Wulff*, 428 U.S. 106, 121 (1976)) (internal quotation marks omitted). Under these circumstances, we decline to exercise our discretion to consider Defendants' deputization argument here.

## CONCLUSION

For the foregoing reasons, we agree with the district court that the acquisition of the 2004 Note was a purchase of a security for purposes of § 16(b), that the conversion of the 2004 Note was also a § 16(b) purchase, and that neither of these purchases come within the debt and borderline transaction exceptions to § 16(b) liability. We further concur that Tonga and Cannell Capital, in addition to Cannell, are subject to disgorgement of profits, and we

33

conclude that the district court did not abuse its discretion in denying Defendants' motion for reconsideration. The judgment of the district court and its denial of the motion for reconsideration are AFFIRMED.