Alfred V. Covello, United States District Judge
This is a class action seeking damages and injunctive relief in connection with the defendants' alleged violations of Regulation E of the Electronic Fund Transfer Act (hereinafter "EFTA"),[1] the Connecticut Unfair Trade Practices Act (hereinafter "CUTPA"),[2] and alleged breach of contract. It is brought pursuant to EFTA, CUTPA, and common law tenets concerning breach of contract.
The defendant has filed the within motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting that counts one through six of the complaint fail to state claims upon which relief may be granted. The issues presented are: 1) whether the complaint states a cause of action for breach of the "Account Agreement"; 2) whether the complaint states a cause of action for breach of the "Opt-In Contract"; 3) whether the complaint states a cause of action for a violation of Regulation E of the EFTA; 4) whether the plaintiff's non-contract state law claims are preempted; 5) whether the complaint sufficiently alleges a breach of the covenant of good faith and fair dealing; 6) whether the complaint sufficiently alleges a claim of unjust enrichment; 7) whether the complaint sufficiently alleges a claim of money had and received; and 8) whether the complaint states a cause of action for a violation of CUTPA.
For the following reasons, the motion to dismiss counts one through six (document no. 18) is GRANTED in part and DENIED in part.
FACTS
The complaint alleges the following facts:
The plaintiff, Terriann Walker (hereinafter "Walker"), was a customer of the defendant, People's United Bank (hereinafter "PUB") at all relevant times to this action.
PUB is a federally chartered stock savings bank. PUB's headquarters are located in Bridgeport, Connecticut. PUB operates over ten branches in the state of Connecticut. Defendants Does 1 through 100 include *371 agents, partners, joint ventures, subsidiaries, and affiliates of PUB. Does 1 through 100 own and/or operate PUB branch locations.
Walker brings this class action to assert claims in her own right, and in her capacity as the class representative of all other persons similarly situated. The "class" is composed of two separate classes. The "Account Balance Class" includes "[a]ll United States residents who have or have had accounts with PUB who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transaction or transactions at issue during the period beginning six years preceding the filing of this Complaint and ending on November 1, 2016." The "Regulation E Class" includes "[a]ll United States residents who have or have had accounts with PUB who incurred an overdraft fee or overdraft fees for ATM or nonrecurring debit card transaction(s) during the period beginning August 15, 2010 and through the present."
The complaint alleges that PUB maintained a policy and practice of assessing an overdraft fee on transactions when there was enough money in the checking account to pay for the transactions presented for payment, and that these charges for overdraft fees breach PUB's contracts with its customers, including Walker and other members of the class.
PUB offers its consumer banking customers a checking account. One of the features of a PUB account is a debit card. Other features of a PUB checking account include the ability to write checks, withdraw money from ATMs, schedule recurring payments, and conduct other types of transactions that debit from a checking account.
In connection with its processing of debit transactions, PUB assesses overdraft fees to customer accounts when it determines that a customer has overdrawn his or her account. The complaint alleges that at all relevant times, PUB had an overdraft program that was contrary to the express terms of its contract with customers, contrary to PUB's representations about its overdraft program to its customers, and contrary to its customers' expectations regarding the assessment of overdraft fees.
PUB entered into a contract with Walker and its other customers known as the "Opt-In Contract." This contract governs the terms under which PUB may assess overdraft fees for ATM and non-recurring debit card transactions. The "Opt-In Contract" states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." The complaint alleges that the "Opt-In Contract" does not describe PUB's actual overdraft practice, and, therefore, that it fails to comply with the requirements of Regulation E of EFTA.
PUB entered into a second contract with Walker and its other customers known at the "Account Agreement." The "Account Agreement" contains a promise that PUB will not charge overdraft fees for any type of transaction where there is enough money in the account to pay for the transaction. The terms of the version of the "Account Agreement" dated March 2016 state, "[a]n Overdraft Fee will be charged against your account if there are insufficient funds in your account to pay an Item drawn against your account." The "Account Agreement" also states, "[a]n overdraft takes place on an account when an Item is presented for payment on the account and there are insufficient funds or insufficient available funds to pay the Item in full." The complaint alleges that these two sections are "potentially in contradiction... creating a possible ambiguity in this second contract within its own terms." Furthermore, the complaint alleges that *372 nowhere in the "Account Agreement" does it state that, for purposes of an overdraft fee, that PUB would deduct the funds in the account holds for pending debit card transactions, or that pending debit card transactions would be subtracted from the balance to create a "lower artificial balance" different from the "real balance" for purposes of assessing an overdraft fee. The complaint alleges that PUB did not include such a clause in the "Account Agreement" until November 2016.
In November 2016, PUB changed its "Account Agreement," and stated that PUB would place holds on pending debit card transactions and thereby reduce the balance available for purposes of assessing when an overdraft would occur. PUB defined "available balance" to account for holds on pending debit card transactions. The complaint alleges that only after the November 2016 Account Agreement went into effect was there consideration of placing holds on pending debit card transactions and deducting those holds from the funds in a customer's account to determine whether an overdraft fee may be assessed.
The complaint alleges that PUB's policy and practice was to assess overdraft fees based on an "artificial internal calculation by which it deducts holds it has placed on either pending debit card transactions or deposits, rather than use the actual money in the account... or the funds in the account... without deduction for pending debit card transactions to determine whether an overdraft has occurred." Furthermore, the complaint alleges that PUB charged Walker and its other customers overdraft fees for ATM and non-recurring card purchases without obtaining consent to do so. The complaint alleges that Walker was harmed by PUB's policy and practice of charging overdraft fees when there was money in her account to cover the transaction.
In count one, the complaint alleges that PUB breached the "Opt-In Contract." Specifically, the complaint alleges that, in the "Opt-In Contract," PUB promised that it would assess overdraft fees "only when there was not enough money in the account to cover the transaction," and that PUB breached the express terms of the contract by "assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue."
In count two, the complaint alleges that PUB breached the "Account Agreement Contract." Specifically, the complaint alleges that, in the "Account Agreement Contract," PUB promised that it would assess overdraft fees "when there were 'insufficient funds' in the account to cover the transaction," and that "[n]owhere did the Account Agreement contract state it would deduct pending debit card transactions for purposes of determining 'sufficient funds' when assessing an overdraft fee." The complaint alleges that PUB breached the express terms of the "Account Agreement Contract" by "assessing overdraft fees when there were sufficient funds in the account to cover the transaction or transactions at issue."
In count three, the complaint alleges that PUB breached the implied covenant of good faith and fair dealing. Specifically, the complaint alleges that PUB breached the implied covenant of good faith and fair dealing "based on its practices of assessing fees when there was enough money in the account to cover the transaction, failing to provide an accurate description of its overdraft program in its Account Agreement contract, and failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions in its Opt-In Contract." The complaint alleges that PUB "executed a contractual obligation in bad faith, depriving [the] [p]laintiff and the [c]lass members of the *373 full benefit of the contract." In count three, the complaint also alleges that "[a]s a result of the wrongful misconduct... [the] [d]efendant unjustly received millions of dollars in overdraft fees."
In count four, the complaint alleges that PUB "has obtained money from [the] [p]laintiff and the [c]lass members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact," and that, as a result, PUB "has in its possession money which, inequity, belongs to [the] [p]laintiff and the [c]lass members."
In count five, the complaint alleges that "[b]y charging overdraft fees on ATM and nonrecurring transactions, PUB violated Regulation E... whose 'primary objective' is 'the protection of consumers' and which 'carries out the purposes of [EFTA]...' whose 'primary objective' is also 'the provision of individual consumer rights.' " Specifically, the complaint alleges that PUB "failed to comply with Regulation E... which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions," and that PUB "failed to comply with the... opt-in requirements, including failing to provide its customers with a valid description of the overdraft program," in that "it states that an overdraft occurs when there is not enough money in the account to cover a transaction but PUB pays it anyway, when in fact PUB assesses overdraft fees when there is enough money in the account to pay for the transaction at issue."
In count six, the complaint alleges that PUB "has engaged in unfair and/or deceptive acts or practices against [the] [p]laintiff and the [c]lass members in violation of the Connecticut Unfair Trade Practices Act," in that PUB "promised [the] [p]laintiff and the [c]lass members in its contracts and in other representations, including marketing materials, that it would only assess fees for overdrafts where the transaction at issue exceeded the amount of money in the customer's account." The complaint alleges that "[t]hose promises were intended to induce [the] [p]laintiff to engage in an obligation, signing up for an account with [the] [d]efendant, and/or entry into [the] [d]efendant's overdraft program, and they were untrue."
STANDARD
The court must grant a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if a plaintiff fails to establish a claim upon which relief may be granted. A motion to dismiss "assess[es] the legal feasibility of the complaint, [but it does] not ... assay the weight of the evidence which might be offered in support thereof." Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984). When ruling on a motion to dismiss, the court must accept that the well-pleaded facts alleged in the complaint are true and draw all reasonable inferences from those facts in favor of the plaintiff. See Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).
The issue at this juncture is not whether the plaintiff will prevail, but whether she should have the opportunity to prove her claim. See Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ); see also Gibbons v. Malone, 703 F.3d 595, 599 (2d Cir. 2013). "A claim has facial plausibility when the plaintiff *374 pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 ; see also Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (stating that a complaint must provide more than "a formulaic recitation of the elements of a cause of action"). In its review of a 12(b)(6) motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993).
DISCUSSION
I. Count Two: Breach of the Account Agreement
The defendants first argue that "[t]he plaintiff's claim for breach of the account agreement in the second count fails because the plain language of the document makes clear that overdraft fees may be based on available balance." Specifically, the defendants aver that "the relevant language [of the "Account Agreement"] unambiguously discloses both the effect of account holds on the plaintiff's available balance, and the fact that the available balance will be used to assess overdraft fees."
Walker responds, "[w]ith respect to the overdraft fee program for other types of debit transactions (checks, ACH, recurring debit card transactions), PUB's practice... breaches the Account Agreement." Specifically, Walker avers that the "Account Agreement" indicates that "overdraft fees will not be assessed unless the account balance, in its entirety, is deficient."
In Connecticut, "[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C., 311 Conn. 282, 291, 87 A.3d 534 (2014).
"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous," which is "a question of law to be resolved by the courts." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016) (internal citation omitted). A contract is unambiguous if "the contract language has a definite and precise meaning... and concerning which there is no reasonable basis for a difference of opinion." Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted).
In this case, the complaint alleges that in the "Account Agreement," PUB promised that it would "assess overdraft fees when there were 'insufficient funds' in the account to cover the transaction," and that PUB "breached the express terms of the Account Agreement contract by, inter alia, assessing overdraft fees when there were sufficient funds in the account to cover the transaction or transactions at issue." The parties disagree over whether the "Account Agreement" terms indicate whether PUB will use the "available" balance or "ledger" balance in determining overdraft fees. The complaint alleges that the "Account Agreement" does not state that it would "deduct pending debit card transactions for purposes of determining 'sufficient funds' when assessing an overdraft fee. The court concludes that, as alleged in the complaint, there is a reasonable basis for a difference of opinion concerning the language of the "Account Agreement." Because the complaint alleges sufficient facts that PUB breached the "Account Agreement," PUB's motion to *375 dismiss count two for failure to state a cause of action is denied.
II. Count One: Breach of the Opt-In Contract
The defendants next argue that Walker's "first count, for 'breach' of the Regulation E Opt-In Form, should be dismissed." Specifically, the defendants argue, "the Opt-In Form, even if it can be said to be a contract, must be construed together with the Account Agreement, which clearly belies the plaintiff's allegations," and that, "[c]onstrued together, the Opt-In Form and the Account Agreement confirm overdraft fees will be based on the available balance."
Walker responds, "PUB has clearly promised that an overdraft does not occur-and an overdraft fee will not be assessed on ATM and nonrecurring debit card transactions-when the account, in its entirety, contains more money than has been requested." Specifically, Walker avers that, "[t]he Opt-In [c]ontract makes no mention of holds on deposits or on funds earmarked for pending transactions, and fails to define or even include the term "ledger balance," and that, "[t]he Opt-In contract and the Account Agreement cannot be construed together."
"In determining whether a contract is ambiguous, the words of the contract must be given 'their natural and ordinary meaning.' " United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 670, 791 A.2d 546 (2002) (citing Kelly v. Figueiredo, 223 Conn. 31, 35, 610 A.2d 1296 (1992) ). "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous... By contrast, language is unambiguous when it has a definite and precise meaning... concerning which there is no reasonable basis for a difference of opinion." Mount Vernon Fire Ins. Co. v. El Rancho de Pancho, LLC, 985 F.Supp.2d 235, 239-40 (D. Conn. 2013) (citing Goldberg v. Hartford Fire Ins. Co., 269 Conn. 550, 559, 849 A.2d 368 (2004) ).
"When there are multiple writings regarding the same transaction, the writings should be considered together to determine the intent of the parties." Mongillo v. Commissioner of Transp., 214 Conn. 225, 229, 571 A.2d 112 (1990) (citing Schubert v. Ivey, 158 Conn. 583, 587, 264 A.2d 562 (1969) ).
In this case, the "Opt-In Form" and the "Account Agreement" both relate to overdrafts. Furthermore, the "Opt-In Form" and the "Account Agreement" both refer to one another in their terms. Therefore, the "Opt-In Form" and the "Account Agreement" must be construed together.
However, the court concludes, after accepting all well-pleaded facts as true and drawing all inferences in favor of Walker, that the complaint alleges sufficient facts to establish a cause of action for breach of contract of the "Opt-In Form." Even construed together, the terms of the contract, as alleged in the complaint, are ambiguous as to when overdraft fees will be charged. The complaint alleges that in the "Opt-In Contract," PUB promised that it would "assess overdraft fees only when there was not enough money in the account to cover the transaction." As alleged in the complaint, the terms of the contract are ambiguous as to when customers will be charged overdraft fees. The "Opt-In Contract" states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." The complaint alleges that PUB assessed overdraft fees when "there was money in the account to cover the transaction or transactions at issue." The court concludes that the complaint sufficiently states a claim for breach of contract with respect to the "Opt-In Contract."
*376 III. Count Five: Regulation E of EFTA
PUB next argues that "PUB did not violate Regulation E." Specifically, PUB argues, "the Opt-In Form does not say PUB will assess fees based on the 'ledger' balance and it cannot be interpreted to mean anything other than that Uncollected Fees will be assessed based on available balance," and that, "[a]s a result, the plaintiff's claim fails as a matter of law."
Walker responds that, "[b]y charging overdraft fees on ATM and nonrecurring transactions, PUB violated Reg. E... whose 'primary objective' is 'the protection of consumers.' " Specifically, Walker avers that the charges violated Regulation E's "Opt-In Rule," in that "PUB's description of its overdraft service in its "Opt-In Contract" does not match its actual practice," and "[t]he language is definitely not so clear and understandable that a consumer would know from reading it that PUB uses the available balance method."
Regulation E of the Electronic Fund Transfer Act defines "overdraft service" as "a service under which a financial institution assesses a fee or charge on a consumer's account... when the consumer has insufficient or unavailable funds in the account." 12 C.F.R. § 1005.17(a). The "Opt-In Rule" of Regulation E states, "A financial institution... shall not assess a fee or charge... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing... describing the institution's overdraft service" and "(ii) [p]rovides a reasonable opportunity for the consumer to affirmatively consent." 12 C.F.R. § 1005.17(b).
In this case, the complaint alleges that the "Opt-In Form" fails to satisfy the requirements of Regulation E of EFTA, in that it "states that an overdraft occurs when there is not enough money in the account to cover a transaction but PUB pays it anyway, when in fact PUB assesses overdraft fees when there is enough money in the account to pay for the transaction at issue." The "Opt-In Form" states that PUB will assess overdraft fees based on whether the consumer has "enough money" in his or her account "to cover a transaction." The complaint alleges that these terms of the "Opt-In Form" fail to "provide customers with a valid description of the overdraft program which meets the strictures of [Regulation E]." The court concludes that the allegations in the complaint are sufficient to establish a cause of action for a violation of EFTA.[3]
IV. Preemption of Non-Contract, State Law Claims
PUB next argues that "all of the counts other than the express contract and EFTA counts also must be dismissed because they are preempted by federal law conferring on PUB the authority to assess and collect overdraft fees."
Walker responds, "[the] [p]laintiff's non-contract, state-law claims are not preempted." Specifically, Walker avers, "PUB cannot meet its burden of proving preemption," because, "PUB presents the same preemption arguments that have been repeatedly rejected in overdraft fee cases," and "PUB's preemption arguments remain unfounded."
The Supremacy Clause of the United States Constitution, article VI, clause 2, provides that "the laws of the *377 United States... shall be the supreme law of the land," thereby "invalidat[ing] state laws that interfere with, or are contrary to, federal law." Air Transp. Ass'n of Am., Inc. v. Cuomo, 520 F.3d 218, 220 (2d Cir. 2008) (internal citation omitted). "Federal preemption of a state statute can be express or implied, and generally occurs: [1] where Congress has expressly preempted state law, [2] where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or [3] where federal law conflicts with state law." SPGGC, LLC v. Blumenthal, 505 F.3d 183, 188 (2d Cir. 2007). "Conflict preemption... occurs when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. State law is in 'irreconcilable conflict' with federal law, and hence preempted by federal law, when compliance with the state statute would frustrate the purposes of the federal scheme." Pacific Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 351 (2d Cir. 2008) (internal citations omitted). "[I]n order for conflict preemption to apply, the activity that is forbidden by state law need not be required by federal law; it is sufficient that the activity that state law prohibits is federally authorized." Id., at 351-52.
The Supreme Court has "interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily preempting, contrary state law." Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 32, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). However, "[f]ederally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." Watters v. Wachovia Bank, N.A., 550 U.S. 1, 6, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007). In analyzing preemption, the court asks whether the state law "prevent[s] or significantly interfere[s] with the national bank's exercise of its powers." Barnett, 517 U.S. at 33, 116 S.Ct. 1103.
The National Bank Act (hereinafter "NBA") grants national banks such as PUB the power to "receiv[e] deposits," and "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C.A. § 24 (Seventh). The Office of the Comptroller of the Currency's (hereinafter "OCC") regulations provide that "[a] national bank may receive deposits and engage in any activity incidental to receiving deposits... subject to such... limitations prescribed by the Comptroller of the Currency and any other applicable Federal law." 12 C.F.R. § 7.4007(a). In enacting the NBA, Congress created a "mixed state/federal regime[ ] in which the Federal Government exercises general oversight while leaving state substantive law in place." Cuomo v. Clearing House Assn., L.L.C., 557 U.S. 519, 519, 129 S.Ct. 2710, 174 L.Ed.2d 464 (2009).
The OCC's regulations also state that national banks have the authority to "charge [the bank's] customers non-interest charges and fees, including deposit account service charges." 12 C.F.R. § 7.4002(a). "The establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." 12 C.F.R. § 7.4002(b).
In this case, the non-contract, state laws upon which the plaintiffs base their claims do not prohibit any requirements of the NBA or the OCC regulations, nor do such state laws require national banks to do anything that the federal laws prohibit. The non-contract, state laws at *378 issue in this case are laws of general applicability, and are not specifically targeted at national banks. The court concludes that the plaintiff's non-contract, state law claims are not preempted.
V. Count Three: Covenant of Good Faith and Fair Dealing
PUB next argues that the covenant of good faith and fair dealing count fails because it does not allege a breach of any discretionary term of the contract. Specifically, PUB argues, "[h]ere, there simply is no discretionary term alleges to be at issue. Instead, the plaintiff's claim-however mistaken-is precisely that the fees charged to her were contrary to the express terms of the account documents.
Walker responds that she "has properly alleged that PUB breached the implied covenant of good faith and fair dealing by charging overdraft fees when there existed enough money in its customers' accounts to complete the requested transaction, after having drafted and executed two contracts which clearly state that it would not do so." Walker avers that "PUB breached the implied covenant by choosing to use the available balance in a clear bad-faith violation of its contractual agreements."
The "duty of good faith and fair dealing is a covenant implied into a contract or contractual relationship." De La Concha of Hartford, Inc., 269 Conn. 424, 849 A.2d 382 (2004) (quoting Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 566, 479 A.2d 781 (1984) ). The covenant of good faith and fair dealing "presupposes that the terms and purposes of the contract are agreed upon by the parties" and that the core of the dispute is a "party's discretionary application or interpretation of a contract term." Celentano v. Oaks Condominium Assn., 265 Conn. 579, 830 A.2d 164 (2003). In order to constitute a breach of the covenant of good faith and fair dealing, "the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." Alexandru v. Strong, 81 Conn. App. 68, 80-81, 837 A.2d 875 (2004).
In terms of good faith and fair dealing, a defendant will show bad faith when he "neglect[s] or refus[es] to fulfill some duty or some contractual obligation ... prompted by ... some interested or sinister motive .... Bad faith means more than mere negligence; it involves a dishonest purpose." Habetz v. Condon, 224 Conn. 231, 237, 618 A.2d 501 (1992).
In this case, the complaint alleges that PUB promised that it "would assess overdraft fees only when there was not enough money in the account to cover the transaction," but instead, assessed fees "when there was not enough money in the account to cover the transaction." Furthermore, the complaint alleges that PUB breached the implied covenant of good faith and fair dealing by "failing to provide an accurate description of its overall program for non-recurring debit and ATM transactions in its Opt-In Contract." The complaint also alleges that PUB "executed a contractual obligation in bad faith, depriving Plaintiff and the Class members of the full benefit of the contract." The court concludes that the complaint alleges sufficient facts to state a claim for breach of the covenant of good faith and fair dealing.
VI. Count Three: Unjust Enrichment
PUB next argues that Walker's unjust enrichment claim fails "[b]ecause an express contract governs the plaintiff's account and the overdraft fees." Specifically, PUB argues that "the plaintiff alleges the existence of two supposed contracts with no allegations that either of them are unenforceable or that she cannot recover on the contracts."
*379 Walker responds that she has "clearly met" the pleading requirements for her claim of unjust enrichment, "in that she has alleged that PUB was benefitted from the receipt of overdraft fees for which she was not compensated, and that the failure to compensate her for the fees was to her detriment." Walker avers that she may plead unjust enrichment in the alternative because, "[u]nder [Federal Rule of Civil Procedure] 8(d), the [c]ourt cannot deprive [the] [p]laintiff of the opportunity to pursue all possible forms of relief at this early state of litigation."
Unjust enrichment is a "form[ ] of the equitable remedy of restitution by which a plaintiff may recover the benefit conferred on a defendant in situations where no express contract has been entered into by the parties." Burns v. Koellmer, 11 Conn. App. 375, 385, 527 A.2d 1210 (1987). "Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 283, 649 A.2d 518 (1994) (internal citation omitted). "[L]ack of a remedy under [a] contract is a precondition for recovery based upon unjust enrichment." Gagne v. Vaccaro, 255 Conn. 390, 401, 766 A.2d 416 (2001).
Federal Rule of Civil Procedure 8(d)(2) states, "A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). Furthermore, Federal Rule of Civil Procedure 8(d)(3) states, "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).
In this case, the complaint alleges that as a result of PUB's alleged wrongful misconduct, PUB "unjustly received millions of dollars in overdraft fees" from its customers. The complaint also alleges that PUB "voluntarily accepted and retained the benefit conferred," and that if it were allowed to retain such funds, it "would be unjustly enriched." Therefore, Walker has alleged sufficient facts to state a claim for unjust enrichment. At this stage in the proceedings, the complaint's inconsistent allegations do not preclude Walker from alleging unjust enrichment in the alternative. As such, PUB's motion to dismiss Walker's claim of unjust enrichment is denied.
VII. Count Four: Money Had and Received
PUB next argues, "[t]he money had and received count is also barred by the express contract allegations, and because there is no allegation that the plaintiff gave money to PUB by mistake." PUB avers that "this count fails to state a claim because a money had and received action lies only in situations in which the plaintiff has paid money to the defendant by mistake," and that "[t]he plaintiff makes no such allegation of mistake, and to do so would be manifestly incompatible with the other facts pled in her complaint-that PUB supposedly took the money without proper authorization under the contracts."
Walker responds that she has "clearly met" the pleading requirements of money had and received, "in that she has alleged that she paid PUB overdraft fees which she mistakenly believed she owed, that PUB received the overdraft fees and that PUB benefitted from the receipt." Walker avers that "under Rule 8(d) [of the Federal Rules of Civil Procedure], [the] [p]laintiff *380 may plead her claim for money had and received in the alternative."
"The action for money had and received is an equitable action to recover back money paid by mistake, where the payor is free from any moral or legal obligation to make the payment and the payee in good conscience has no right to retain it." Bridgeport Hydraulic Co. v. Bridgeport, 103 Conn. 249, 261, 130 A. 164 (1925). "Is the plaintiff in this action, as between it and the defendant, in equity and good conscience entitled to the money? If it is, then it is entitled to recover. The real ground of recovery is the equitable right of the plaintiff to the money." Id., at 262, 130 A. 164. However, "[i]f the money was not mistakenly paid or was paid for the purpose of potentially compromising a claim or was paid gratuitously, then a plaintiff cannot recover." Town of Stratford v. Castater, No. CV-10-6011629-S, 2011 WL 1288675 (Conn. Super. Lager, J. Mar. 15, 2011).
In this case, the complaint alleges that PUB has "obtained money from [the] [p]laintiff and the [c]lass members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact," and that, "[a]s a result, [the] [d]efendant has in its possession money which, inequity, belongs to [the] [p]laintiff and the [c]lass members." The court concludes that that the complaint alleges sufficient facts to state a claim, in the alternative, for money had and received.
VIII. Count Six: CUTPA
PUB next argues that the "CUTPA count fails because it merely alleges a breach of contract without aggravating circumstances." Specifically, PUB avers that because Walker's "entire case is contract-centered," and "[n]othing about that dispute suggests unfair or deceptive practices... the purported CUTPA claim is one and the same as the contract dispute, and must be dismissed."
Walker responds, " 'a violation of CUTPA may be established by showing either an actual deceptive practice... or a practice amounting to a violation of public policy.' Web Press Servs. Corp. v. New London Motors, Inc., 203 Conn. 342, 355, 525 A.2d 57 (1987)." Walker avers, "assessing overdraft fees based on the available balance method when the relevant contracts indicate that the actual balance would be used, as alleged here, is an unfair practice."
CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). For CUTPA purposes, "trade or commerce" includes "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a.
In determining whether a practice is unfair and violates CUTPA, Connecticut courts examine "(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors, or other businesspersons." Ulbrich v. Groth, 310 Conn. 375, 409, 78 A.3d 76 (2013). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it *381 meets one of the criteria or because to a lesser extent it meets all three." Id.
The Connecticut supreme court has held that "in order to prevail in a CUTPA action, a plaintiff must establish both that the defendant has engaged in a prohibited act and that, 'as a result of' this act, the plaintiff suffered an injury." Abrahams v. Young & Rubicam, Inc., 240 Conn. 300, 306, 692 A.2d 709 (1997). "A simple breach of contract cannot constitute a violation of the Connecticut Unfair Trade Practices Act. There must be significant aggravating circumstances." Boulevard Assocs. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1040 (2d Cir. 1995) (internal citation omitted).
In this case, Walker claims that PUB assessed overdraft fees where the contract did not authorize the fees. Walker has not alleged any aggravating circumstances beyond breach of contract that would suffice to state a claim for unfair or deceptive practices. Because Walker has not pled or substantiated aggravating circumstances on which she bases an independent cause of action under CUTPA, Walker does not allege sufficient facts to state a claim under CUTPA. The court concludes that Walker's claim for violation of CUTPA is dismissed.
CONCLUSION
For the reasons stated above, the defendant's motion to dismiss the plaintiff's complaint (doc. no. 18) is granted in part and denied in part. The motion to dismiss count six is granted. The motion to dismiss counts one through five is denied.
It is so ordered, this 30th day of March 2018, at Hartford, Connecticut.

12 C.F.R. §§ 1005.17 etseq.

Conn. Gen. Stat. §§ 42-110a etseq.

PUB also argues in its motion to dismiss that Walker's EFTA claim is "barred by the statute of limitations and should be dismissed." However, because the bank statements are outside of the record, they are beyond the scope of a motion to dismiss. The court concludes that the defendant's motion to dismiss on this ground is denied.